**PAKTANK CORPORATION—DEER PARK TERMINAL**

v.

**M/V M.E. NUNEZ, her Engines, Tackle, Appurtenances, in rem, and Edward L. McGaha d/b/a M & M Towing Company, Inc. in personam.**

**No. Civ.A. G–97–715.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 3, 1999.

Ted C. Litton, Royston Rayzor Vickery and Williams, Houston, TX, for Ted Litton, mediator.

James T. Brown, Legge Farrow Kimmitt and McGrath, Houston, TX, for Deer Park Terminal, plaintiff.

Richard Paul Martini, Billings & Solomon, Houston, TX, for M/V M.E. Nunez, her Engines, Tackle, Appurtances.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

The above cause came on for a non-jury trial commencing December 15, 1998 and concluding on December 17, 1998, Honorable Samuel B. Kent presiding. The Court having carefully considered the testimony of all witnesses presented live and by deposition, all exhibits admitted during the course of the trial, all pleadings filed in the case, the Joint Pre–Trial Order, statements and arguments of counsel, and the proposed Findings of Fact and Conclusions of Law submitted by Plaintiff and Defendant, hereby enters its Findings of Fact and Conclusions of Law.

Paktank brings this suit for damages sustained by the No. 1 Breasting Dolphin of its No. 3 Ship Dock in an allision that occurred on January 19, 1996. Defendant's tug, the M.E. NUNEZ and its tow, the barge HOL-LYWOOD 2027 ("HW 2027") allided with that structure and remained at that facility for an investigation immediately thereafter. The M.E. NUNEZ and its tow were traversing the area of the channel in which Ship Dock No. 3 is located at the time of the incident, and was not intending to dock at Ship Dock No. 3. According to the vessel's captain, for some unknown reason, the vessel came left causing the forward port corner of the barge to allide with the No. 1 Breasting Dolphin of Ship Dock No. 3. Neither Paktank nor its dock facility caused or contributed to the allision. The barge was fully loaded with styrene at the time of impact.

Paktank contends that the barge damaged the wood and steel protective fender mat, casting it adrift. The barge then continued past the fender mat going underneath the cement dolphin structure striking a forty-two inch cylindrical support pile that is driven into the seabed. Defendant admits its vessel allided with the fender mat and damaged it to an extent, but denies its barge ever struck the forty-two inch pile supporting the cement dolphin.

## I.

### FINDINGS OF FACT

1. Paktank Corporation—Deer Park Terminal ("Paktank") provides storage and handling facilities for various bulk liquid chemicals. Its Deer Park facility consists of a tank farm with the requisite truck, rail, and marine loading and discharge facilities. M & M Towing Company, Inc. ("M & M Towing") is an inland tugboat operator, and was the owner and operator of the tug M.E. NUNEZ at the time of this incident.

#### The Allision

2. January 19, 1996, the tug M.E. NU-NEZ and its barge, HW 2027, were inbound in the Houston Ship Channel. They were not intending to call at Paktank's Ship Dock No. 3. According to the Captain, the vessel unexpectedly came left and allided with the No. 1 breasting dolphin of that facility. While Defendant admits its vessel struck the fender mat protecting the cement breasting dolphin, it denies the barge ever went past the fender mat striking the cement dolphin structure behind it. The fender mat consists of vertical wooden timbers mounted on a lattice of horizontal steel H-beams or "whales". It is affixed to the cement dolphin by a large flexible rubber cylinder held in place by various sway chains. Vertically, it is supported by three steel "H" support beams driven

into the seabed and bolted to the bottom beam or "whale" of the fender mat. The dolphin cap consists of a cement structure or "cap" poured over six cylindrical support piles, also driven into the seabed. Each pile is a forty-two inch steel pipe with a one-inch wall diameter. Mounted on top of the breasting dolphin are two, one-hundred ton-rated bollards used to secure the mooring lines of vessels calling at the dock. The fender mat is designed to protect the cement structure from vessels breasting against the dock as the moor at Ship Dock No. 3. The vessels lay against the mat and impart a compressive stress at an angle 90˜ to the face of the mat In this case, the barge impacted the fender mat from the side. The mat is not designed to withstand shearing stresses imparted from the side. In addition to suffering damage, the mat came partially adrift from the dolphin. This is evident in the numerous photographs and was substantiated by testimony of a witness from both parties. The barge, which was fully loaded, continued on underneath the cement dolphin cap striking a support pile, breaking it loose from the cement cap. Due to the extent of the damage, the dolphin was unsafe to use and repair was necessary.

3. While Defendant denies ever striking the cement cap and metal support pile, chunks of cement and timber were found on the deck of the barge at the site of impact. Captain Miller of the M.E. NUNEZ admitted that there were no chunks of cement or timber on his barge before impact, but there were after impact. He admitted he might have "barely" struck the concrete portion of the structure. Plaintiff's Exhibit 7K was a photo taken shortly after the allision showing pieces of concrete and broken timber on the deck of the barge. At trial Capt. Miller identified this photograph as depicting the cement and wood he found on his barge immediately after the impact. He also stated that at the time of impact he was in the wheelhouse of the tug 285 feet aft of the barge's bow. The barge came left and struck the dolphin with the port, or left, side of the bow. Capt. Miller admitted that at his next eye exam taken to renew his driver's license some six months after the incident, his license was revoked because he had no sight in his left eye.

4. There is an eye witness who saw the bow of the barge stuck up underneath the fender mat and cement dolphin cap. Dockman Jesse Villarreal was in the dockman's shack on Ship Dock 3 when he heard a loud crash. He walked to the edge of Ship Dock No. 3 to investigate. Villarreal had a clear view of the No. 1 Breasting Dolphin. He saw the bow of the HW 2027 underneath both the cement dolphin cap and the fender mat. The barge was stopped and he could hear the engines of the tug revving as the tug came astern in order to back out from underneath the dolphin cap. As the barge backed away, Mr. Villarreal heard scraping sounds of metal and concrete, and also saw the concrete that had fallen onto the deck of the barge. The deckhand sent by Capt. Miller to inspect the barge after impact, John Dickey, also testified he found cement debris on the deck of the barge where the impact occurred. It is the Court's belief this cement fell onto the barge when it impacted the support pile, breaking cement loose from the underside of the cement cap where the pile was seated as seen in the numerous photographs of the underside of the cement cap.

5. The Captain of the tug was inattentive in his duties. Capt. Miller testified he was navigating close by the dolphin, yet he did not place a lookout on the bow of the barge. He failed to make use of all available means to determine that a risk of allision existed, including placing a lookout at the bow of his tow. M & M Towing did not provide the vessel with any maneuvering charac-

teristics to aid the Captain in determining how his vessel would react to various helm and engine commands. M & M Towing did not inform the Captain of the weight of the cargo or the deadweight of the barge. There were no operations or safety manuals on board the vessel. The Defendant utilized an underpowered and/an unseaworthy tug to push the barge in question. Defendant's vessel violated Inland Navigation Rules 5, 6, 7 and 8. (33 U.S.C. §§ 2001–38.)

6. While Capt. Miller first testified that there was nothing wrong with the engines on the tug, and that the tug was not put in a shipyard for inspection or repair as a result of this incident, the Court finds that there were problems with the engines of the M.E. NUNEZ. Capt. Miller later admitted that the vessel's deck log indicated a visit to Bludworth Bond Shipyard in Houston only 10 days after the incident. While Capt. Miller testified no engine repairs were done, he could not explain invoices and M & M payment ledgers admitted into evidence indicating expenses incurred for engine parts and engine repairs during that time. Kevin Harris, a Paktank employee, was present at a meeting between Capt. Miller and the Hollywood port captain in which the port captain asked Miller what had happened. Capt. Miller stated that the tug was underpowered for the barge in question and did not have the power it used to, and further that he was going to take it out of service for inspection immediately after discharging. Capt. Miller further stated that wind and weather conditions had nothing to do with the incident. While Capt. Miller strenuously denied these admissions at trial, they are also recorded in Hollywood's file with regard to the incident (Plaintiff's Exhibit 2). These admissions are further substantiated by statements of other Paktank witnesses, specifically L. Brown (Plaintiff's Exhibit 1) and Steve Aaron (Plaintiff's Exhibit 3). The Hollywood dispatcher's Incident/Accident Report was admitted as Plaintiff's Exhibit 2. According to that report, Capt. Miller also reported that the head log was damaged from the port pushing skeg to the port bow knuckle.

7. Shortly after the incident, numerous photographs were taken by surveyors representing Paktank, M & M Towing, and Hollywood Marine (the owner of the barge). All photographs were admitted with objection and show a severely damaged support pile that is broken loose from the underside of the cement cap. The support pile has a fresh dent with the protective tar coating and marine growth broken away at the site of impact. When compared to the ambient rust, if any, on the structure, it is clear the damage is new. As for the underside of the cement cap, the photographs show fresh traumatic "spalling", or breaking away, of pieces of concrete. Also uncovered by the impact was the steel flange at the end of the support pile which was previously imbedded in the concrete cap. The steel flange is broken loose from the cement cap and its surface has the appearance of clean, white blasted steel. There was no rust on the flange which sits only a few feet from the water's surface. Also exposed was the steel "re-bar" which was previously imbedded in the cement. Re-bar does not have any anti-corrosive coating as it is intended to be imbedded in protective concrete. The numerous pieces of re-bar in the photos show little or no rust. As for the spalling itself, it appears fresh when compared to the color of the non-damaged concrete. The only spalling on the cement structure was in the area surrounding the pile that was struck. The photographs also show that the fender mat is broken away and cast partially adrift from the cement dolphin.

8. The Court finds that while there may have been some prior damage, the fender mat was damaged by the HW 2027. This damage consisted of timber and steel frame damage, as well as

damage to the three vertical support beams which run from the seabed to the bottom whale or horizontal beam of the fender. The "downstream" or east vertical support beam where the barge made impact was severed from the mat, and the other two vertical beams were deformed from their top down to about 5 feet below the water level. This was substantiated by the testimony of witnesses for both sides, as well as by the report of the S & J Diving, Inc., the contractor that performed an underwater damage survey on January 23, 1996 (Plaintiff's Exhibit 20). The fender mat was also cast partially adrift from the cement dolphin and was hanging askew after the impact. This was due to several sway chains and u-bolts being carried away by the sheering stress imparted on the fender mat by the barge, as well as the deformation of all three vertical support beams.

9. The HW 2027 also damaged the 42 inch support pile and cement dolphin cap. The barge HW2027 was fully loaded with product. Paktank retained engineer Richard A. Zimmerman who reviewed the deformation of the 42 inch steel pile. Relying on the known deformation surveyed post-incident, and considering the known physical characteristics of the steel pipe, it is relatively easy for an engineer to determine how many "kips" (a unit of force equal to 1,000 pounds) would be required to create a given deformation. Given that the loaded barge weighed approximately 3,485 short tons, and using a speed of approximately .8 knots, the impact force imparted by the barge on the 42 inch pile would have been approximately 1,240 kips. Using beam loading and bending stress formulae for this particular pipe, he concluded that an impact force of 1,240 kips would be sufficient to stress the 42 inch pile pipe beyond its yield point and result in the actual permanent deformation discovered by all parties upon joint survey. Mr. Zimmerman's calculations did not even consider the weight of the tug M.E. NUNEZ.

10. The Defendants strenuously contested the fact that the barge impacted anything other than the fender mat. Indeed, both experts for the Defendant, Mark Underhill and Roger Owens, P.E. testified that the barge struck nothing other than a "glancing" blow on the mat only, sideswiping it and continuing its forward motion up the channel. Both gentlemen testified that the barge never stopped its forward motion. Mr. Zimmerman, a professional engineer hired as an expert by the Plaintiff, testified that due to the extreme low tide and deeply laden condition, the barge had very little freeboard (surface above its waterline) and went underneath the fender mat severing the downstream or east support pile and parting various sway chains and couplings. The barge continued up underneath the cement cap striking the 42 inch pile where it came to a stop. Mr. Owens' testified that he had reviewed Mr. Zimmerman's calculations with regard to the force of the barge being sufficient to cause the known deformation and he agreed with them. However, Mr. Owens disagreed that the barge ever actually impacted the pile. Mr. Owens testified that in order for Mr. Zimmerman's opinion to be correct, the barge would have had to come to a stop. Indeed, all the experts agreed that a vessel striking the pile in the angle in which it was struck and imparting that damage found would have had to come to a full stop. Mr. Owens, however, had not been provided with the deposition or trial testimony of Jesse Villarreal or John Dickey. The testimony of these witnesses established that the barge did indeed come to a stop after impact.

11. The opinions of both Mr. Underhill and Mr. Owens ignore the testimony of Jesse Villarreal, whom the Court found credible. Mr. Villarreal stated he saw the bow of the barge under-

neath the fender mat and cement dolphin cap. He then observed the tug backing out from underneath the structure. The testimony of John Dickey, the deckhand of the M.E. NUNEZ, also proved that the barge indeed came to a stop immediately after impact. Mr. Dickey testified that after impact Capt. Miller told him that he had hit the dolphin and he was "going to try to bring the head [of the barge] back off." He instructed Mr. Dickey to proceed to the bow of the barge and inspect for damage to both the barge and dolphin. Mr. Dickey testified when he got to the bow, the tow was stopped in the water: "It was stopped, and was probably about a foot off of it when I got up there." He then testified that Capt. Miller backed away from the structure and then proceeded to his next dock. The sworn testimony of Mr. Villarreal and Mr. Dickey render the opinions of Owens and Underhill fatally flawed with regard to their belief that the barge could not have impacted the 42″ support pile. In addition, the physical evidence by way of cement pieces on the deck of the barge was corroborated by the testimony of Capt. Miller himself, as well as his in-court identification of the photographs showing the cement.

12. The Defendant provided no credible explanation for the presence of the concrete immediately after impact. Defendant contends the barge was at all times on the *opposite* side of the fender mat from the concrete cap. Defendant also contends the barge never stopped its forward motion, rather it "sideswiped" the mat and kept going. The concrete pieces were found on the bow of the barge. The Court finds it highly unlikely that the concrete pieces broke loose from the underside of the cement cap, levitated in midair instead of falling onto the deck of the barge, and/or directly into the water. It is likewise unlikely that the pieces would then travel horizontally 5–6 feet through small gaps in the fender timbers, and concentrate themselves on the deck of the barge at the site of impact as the barge passed by continuing its forward motion upstream.

13. Mr. Zimmerman's opinion as to the barge going underneath the steel whales of the fender mat, severing the downstream vertical support beam and eventually striking the 42″ cylindrical pile underneath the cement dolphin cap is credible and supported by the evidence.

14. The National Oceanic and Atmospheric Administration's ("NOAA") historic tide level data for the date and hour in question, offered by both parties, proves that the tide was minus 2.74 feet below "mean lower low water." This was verified by the tidal information submitted by the Defendant's expert, Mr. Underhill. The design plans for the dolphin and fender mat were drawn using "mean low water" as a sounding datum. Information from the Galveston office of U.S. Army Corps of Engineers (Plaintiff's Exh. 36) indicated that mean low water is .13 feet higher than mean lower low water. As the NOAA information with regards to the height of tide was based on a sounding datum of mean lower low water, and the design plans of the fender mat based on mean low water, .13 feet was added by Mr. Zimmerman to the minus 2.74 water level. This made the actual water level at the time of the impact (converting to inches) 34.44″ below "zero" elevation (mean low water) on the fender mat design plan.

15. The barge's U.S. Coast Guard Certificate of Documentation, and the U.S. Coast Guard's Port State Data on the HW2027, both indicate the vessel had a depth (keel to main deck) of 10.2 feet. Plaintiff's Exh. 28 was the actual petroleum gauger's survey report which contained the barge's tank ullages, as well as the arrival drafts. The arrival drafts were 10 feet forward, and 10 feet aft. This indicates

that it was traveling on an even keel, with .2 feet (2.4 inches) of freeboard at the main deck. The testimony of Mr. Zimmerman, as well as the testimony of Mr. Underhill which was based upon Mr. Underhill's actual field survey of the barge, indicated that there was a "rake," or rising of the deck, from 18 to 24 inches at the bow in area of the impact. Adding this to the freeboard of the barge would result in a maximum freeboard of 20.4″ (assuming an 18″ rake) and 26.4″ (assuming a 24″ rake). The design plans of the fender mat (Plaintiff's Exh. 13) indicate that the bottom of the timbers were 22.44″ above the actual water level. The bottom of the horizontal steel beam on the fender mat to which the vertical wood timbers were attached, was 28.44″ above the actual water level. This was depicted graphically on Plaintiff's Exh. 40, as well as the scale drawings of Plaintiff's expert Mr. Zimmerman (Plaintiff's Exh. 33A–C). Therefore, if the barge had an 18″ rake, it would have missed the fender timbers altogether. If it had a 24″ rake, it would have struck the bottom of the timbers, but not the bottom horizontal steel whale. Timber debris was found on the deck of the barge. However, in either case, the barge would have still struck the vertical support beam. This scenario is supported by the fact that the vertical support beam where the barge went under the fender mat was severed from the mat. Further, Mr. Underhill provided a supplemental report (Plaintiff's Exh. 35) in which he ran a historical analysis of tidal heights in the vicinity of the dolphin. Considering that report and his testimony, it was his opinion that there were 49 days from 1993 through 1996 in which tides were low enough for a barge to damage both the "fender mat and pile." A review of the tidal heights recorded by Mr. Underhill indicate that 46 of these days had tides *higher* than the tide actually encountered by the HW2027 at 0800 on January 19, 1996. Mr. Underhill's opinion in this regard substantiates that of Mr. Zimmerman with regards to the actual mechanics of this incident.

16. Notwithstanding the foregoing, given the damage to the timbers and steel framing of the fender mat, the Court is of the opinion that the HW2027 could have struck the fender mat at a height above the location opined by Mr. Zimmerman and still damaged the 42″ support pile. This would also result in the shearing stress being imparted upon the fender mat as a whole causing damage to the three support beams, the breaking of the sway chains and u-bolts, movement of the fender mat, and ultimate impact of the barge with the 42″ cylindrical pile.

17. Mr. Underhill admitted that at his deposition in this case he stated if the evidence ultimately indicated that there was no cement on the deck of the barge before impact and that cement was found on the barge after the impact, he would change his opinion and opine that the barge probably did impact the 42″ pile. At trial Mr. Underhill admitted that when he drafted his report and gave his deposition testimony, he had not been provided with the sworn deposition testimony of Capt. Miller with regards to finding cement on the barge after the impact, or the testimony of John Dickey or Jesse Villarreal with regard to the barge being stopped in the water, as well as their subsequent discovery of cement debris on deck.

18. The other major premise supporting Mr. Underhill's opinion was the fact that the barge suffered no damage in the incident, other than normal wear and tear. This was simply not the case. A review of the independent marine survey conducted at the request of Hollywood (Plaintiff's Exhibit 15), a non-party to this litigation, and the investigative materials contained in Hollywood's file (Plaintiff's

Exh. 21) indicated that there were fractures in the deck plate adjacent to the head log damage that were not preexisting and were caused by the allision. Further, the surveyor went down into the interior bow void compartment of the barge and found new fractures in the vertical stiffeners (internal strength members) at the deck/head log connection. Mr. Underhill testified that the head log is the strongest portion of the barge as it is designed to absorb impact with docks and other vessels. Further, he admitted that fractures in the internal strength members of the head log are more than mere normal wear and tear. He also testified that the fracture found in the deck plate at the head log connection would allow water to enter the barge and rendered it unseaworthy. The Court is of the opinion that these damages sustained by the barge were substantial and were caused by the impact with the 42″ pile pipe. Most importantly, despite the fact that one of the main basis of his opinion was no barge damage beyond normal wear and tear, Mr. Underhill admitted that the barge was repaired the day after the incident. This is substantiated by Hollywood's file. He did not survey the barge until five months later, after the damage sustained in the incident had been repaired. Curiously, he also testified that when he does a damage survey of a barge, he does it as soon as possible.

### Damages

19. Paktank retained Lloyd Engineering, Inc. to determine if the dolphin could safely be used in its damaged state, and if not, what type of repairs would return it to a serviceable condition. The recommended repairs were carried out by Mid–Gulf Industrial, Inc. The Court finds the repairs to have been reasonable and necessary to return the structure to a safe, serviceable condition.

20. The Court finds that the fender mat and cement dolphin structure were damaged by the M.E. NUNEZ, despite having some minor, prior damage. Mr. Kevin Harris, who was in charge of the inspection, maintenance and repair of the fender mat, testified that the overwhelming damages were sustained in the January 19, 1996 allision.

21. The most costly portion of Paktank's damages, was the damage imparted to the 42″ cylindrical support pile and the cement dolphin cap. This damage was documented by survey reports of both parties, as well as the photographs and oral testimony. They did not preexist the incident. Both parties agree that the damages were substantial and expensive to repair. Kevin Harris was placed in charge of the inspection, maintenance and repair of all Paktank's dock facilities in 1991. At that time, he had an extensive underwater survey of the entire facility conducted to establish a base level of preexisting damage. This underwater survey included the dolphin structure in question and established that it had none of the damage that was discovered after the allision on January 19, 1996. This underwater survey was conduct by an independent diving contractor and was admitted into evidence without objection. Since the 1991 underwater survey, Harris had been in charge of the regular periodic inspection and repairs of the dock facilities. If there had been any damages or repairs to the dolphin in question, Kevin Harris would have had direct responsibility for them. He had no independent recollection of any damage or repairs done to the 42″ pile and cement dolphin cap. Likewise, he reviewed Paktank's files in that regard and could find nothing indicating any damage or repair to the structure. Both he, and his superior Lonnie Kopecky, testified that if damage as substantial and expensive as alleged in this lawsuit had been

sustained by the dolphin, they would remember it. They had no such recollection. Mr. Jerry Burton, Vice-President of Mid–Gulf Industrial Inc., the contractor that performed the repairs, also testified via deposition. Since 1971, he has worked repairing and building marine dock facilities. He agreed that the damages sustained in the allision were fresh, extensive, and expensive to repair. He testified that Mid–Gulf has done most of the repair work to the docks at Paktank's facility. Mid–Gulf had been working on various projects at the Paktank facility since the dolphin in question was first built and he has no recollection of any work ever being done to the concrete dolphin or support pile in question. He had searched his company records pursuant to a subpoena served upon him by the Defendant for repairs done to the pile pipe or cement portion of the dolphin and could find none. He also stated that if his company had done a job as substantial as the one in question, he would remember it. He verified that his company had never previously removed the entire fender mat from this dolphin for repair. He testified that based on his visual inspection of the damage to the dolphin, the damage was consistent with an impact that might have occurred on January 19, 1996.

22. Lonnie Kopecky, the Technical Services Maintenance Manager at Paktank, was in charge of paying for the repairs. The cost of returning the dolphin to a safe and serviceable condition in the form of engineering and design expenses, marine survey expenses, and physical repair costs, was $245,576. Allowing for prior damage, the Court will assess $215,576.00 for this item. Paktank incurred additional costs in mitigating its damages and avoiding demurrage and delay charges by vessels that would otherwise sit out at anchor awaiting a berth. These damages were well documented by Kopecky and consisted of the cost of re-routing six specific vessels to alternate docks. These vessels carried expensive chemicals that were easily contaminated. Pursuant to its duty to mitigate damages, Paktank re-routed these vessels to other docks at its facility which required cross-over pipelines to be rigged, as well as the washing and pigging of the alternate pipelines. Paktank also incurred the expense of the proper disposal of the wash water. These re-routing costs totaled $20,849.50. In addition, during welding operations on the dolphin, Paktank was required to keep extra personnel in the vicinity to stand a firewatch at the cost of $653.20. Paktank also made a claim of $7,800 for the time incurred by Paktank personnel at various project meetings related to the damage and repair. The Court declines to award any damages for these project meetings. The total damages sustained by Paktank as result of the allision are $237,078.70. The Court finds this amount to be reasonable and necessary.

23. The cement dolphin is supported by six 42″ steel piles driven into the seabed. The repairs to the dolphin consisted of the cropping and replacement of the uppermost 20 foot portion of the one pile struck by the barge, along with repair of the cement broken loose from the vicinity of that pile. Both Mr. Zimmerman, as well as the Defendant's expert Mr. Owens, testified that these repairs will not enhance the work life expectancy of the structure as a whole. The structure will naturally decay at the same rate it would have, regardless of the damage and subsequent repair of the pile. The repairs likewise did not enhance the monetary value of the dolphin. Even if it did, the Court has considered such in allowing a $30,-000.00 downward adjustment on account of prior damage.

24. The Court exercises its discretion to determine that both sides shall bear

their own expenses and its taxable costs pursuant to Fed.R.Civ.P. 54, 28 U.S.C. § 1920, and the Local Rules for the Southern District of Texas. The Court awards pre- and post-judgment interest at the rate of 6% per annum.

25. Paktank also seeks attorneys' fees as authorized by Fed.R.Civ.P. 37(c)(2) which holds it if a party refuses to admit the truth of the matter and the other party is forced to prove the truth, the court may award "reasonable expenses incurred in making that proof, including reasonable attorneys' fees." The Court exercises its discretion to respectfully deny this request. The defenses asserted in this case, while not persuasive, is certainly not in bad faith.

## II.

## CONCLUSION OF LAW

1. Jurisdiction and venue in this case were proper and uncontested.

2. The M.E. NUNEZ was a moving vessel that collided with a stationary object, and is presumed negligent. Under the general maritime law and the law of the Fifth Circuit, there is a presumption that when a moving ship collides with a stationary object, the moving ship is at fault. This presumption operates to shift the burden of proof onto the moving ship. The *Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *American Petrofina Pipeline Co. v. M/V SHOKO MARU*, 837 F.2d 1324, 1326 (5th Cir. 1988).

3. Notwithstanding the presumption, the Court finds that the negligence of the Defendant was proven by Paktank at trial. Capt. Miller admitted that he was navigating close aboard a dock facility that was not his intended berth without a lookout. The evidence at trial indicated the tug was underpowered for the barge in question. There was a problem with the engines of the M.E. NUNEZ that

was inspected and/or repaired 10 days after the incident. Capt. Miller failed to make use of all available means to determine that a risk of collision existed as required by the Inland Navigational Rules, including placing a lookout at the bow of his tow. Additionally, M & M Towing did not provide Capt. Miller with any information whatsoever with regards to the maneuvering characteristics of his vessel, or the weight of the cargo and the barge it was pushing. Likewise there were no operation or safety manuals onboard the vessel. In addition, Capt. Miller's admissions immediately after the incident indicates that M & M Towing used an underpowered and/or unseaworthy tug to push the barge in question. In addition, Capt. Miller's eyesight in his left eye, which is the side of the vessel that struck the dolphin, was questionable. The personnel file of Capt. Miller admitted by Defendant at trial discloses that Capt. Miller was not given a pre-employment physical or eye exam prior to being employed as Captain of Defendant's vessel.

4. The Court finds that foregoing acts of negligence proximately caused the damage to Paktank's dolphin. The Court finds no contributory negligence on behalf of Paktank, nor was this affirmative defense pled. The Defendant's own witnesses testified that they did not fault Paktank for the allision.

5. The Court will not reduce the damages suffered by Paktank for depreciation as the repairs to the dolphin neither enhanced the value or extended the life of the structure. In cases involving allisions with a fixed structure, the Fifth Circuit has stated that the measure of damages includes the cost of repairs *without* any deductions for depreciation, if the repairs do not extend the life or enhance the value of the structure. In a case involving a vessel allision with a bridge, the Fifth Circuit stated:

Since the repairs neither enhanced the value nor extended the life of [bridge] reduction of recoverable repair cost by depreciation would leave [the plaintiff] in a significantly worse economic position than before the accident. *Petition of M/V ELAINE JONES*, 480 F.2d 11, 27 (5th Cir.1973). This rule has also been mandated by the Fifth Circuit in vessel allisions with dock structures. In *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (5th Cir.1976), the Court held that "where the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation." *Id.* at 306. In the case at bar, the testimony of experts for both parties established that the repairs to the dolphin did not extend the dolphin's useful life or enhance its value. If the Court were to depreciate the repair costs, it would penalize Paktank and leave it in a worse position than it was before the allision. Paktank merely returned the dolphin to a safe and serviceable condition and should be made whole.

6. The Court finds that the fender mat had prior damage and thus discounts its award by $30,000.00.

7. The Court finds that Paktank fulfilled its duty to mitigate its damages and finds the consequential expenses incurred in doing so to be reasonable and necessary.

8. This was an admiralty action tried to the bench pursuant to the Court's admiralty jurisdiction. Accordingly, an award of interest is properly within the sound discretion of the Court. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir.1986). The Court finds that an award of pre- and post-judgment interest is proper in this case at the rate of 6% per annum on Plaintiff's damages set forth in the Court's Findings of Fact.

9. On the basis of the foregoing findings of fact, Plaintiff has sustained damage in the amount of $237,078.70, and pre- and post-judgment interest as described herein. Each party shall bear its own expenses and taxable costs as incurred herein.

10. To the extent that any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

11. For the reasons set out in the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 58 of Fed. R.Civ.P., Judgment is hereby rendered in favor of Plaintiff on its claim against Defendant. Therefore, Plaintiff, Paktank Corporation—Deer Park Terminal shall have and recover of and from Defendant M & M Towing, Inc. a total amount of $237,078.70, and pre- and post-judgment interest at the rate of 6% per annum, for which execution shall issue if not timely paid.

THIS IS A FINAL JUDGMENT.

### *FINAL JUDGMENT*

This action came on for trial before the Court, Honorable Samuel B. Kent presiding, on December 15, 1998, and concluded December 17, 1998.

It is hereby **ORDERED** that Defendant Edward L. McGaha d/b/a/ M & M Towing Company, Inc. is found liable to Paktank Corporation—Deer Park Terminal for the amount of $237,078.70 plus pre- and post-judgment interest at the rate of 6% per annum until this Judgment is satisfied. Each party shall bear its own taxable costs and expenses incurred herein. Execution shall issue if this Judgment is not timely paid.