Matter of Petition of BOAT DEMAND, INC. as Owner of THE Fishing Vessel DEMAND For Exoneration From or Limitation of Liability.

No. 57-28.

United States District Court
D. Massachusetts.

June 22, 1959.

5. 33 U.S.C.A. § 145n.

Joseph F. Dolan, William T. Conlan, Boston, Mass., for petitioner.

Richard G. Maloney, Robert F. White, Boston, Mass., for respondent.

ALDRICH, District Judge.

The petitioner's vessel Demand, having exploded and sunk at the Boston Fish Pier on February 3, 1957, its claim for exoneration and limitation of liability herein was denied because of the negligence of the owner. D.C., 160 F.Supp.

833. The claimants' allegations of damages were tried on May 13 and 14, 1959. It was stipulated that the damages to the respondent Harbor Oil Co., Inc., with respect to its vessel Narmada, were $3,616.-88; that those to the Trawler Oil Corp. were $406.16 with respect to the vessel Gene and Don, and $811.75 with respect to the vessel Sea Bee; all to be without interest. The disputed items relate to the claims of the Boston Fish Market Corp., hereinafter termed respondent.

■ Respondent's first claim is that it is entitled to the cost of removing the sunken hull so as to free its wharfage space obstructed by the wreck. It is stipulated, somewhat ambiguously, that "the fair cost of raising the Demand and repairing her would far exceed any salvage that might be obtained if she were raised." On May 16, 1957, petitioner wrote letters to the United States Secretary of Defense, Washington, D. C., and the United States Army Engineers (Marine Division) in Boston, in which it recited that on February 3, 1957, the Demand sank at the Fish Pier; that the cost of raising and repairing her would be in excess of her value; that on February 7, 1957, petitioner had attempted to surrender her to the underwriters, but that the underwriters refused to accept, and that the petitioner and the mortgagee now abandon the vessel to the United States. Receipt of these letters was acknowledged. Petitioner asks me to rule that this constituted an abandonment and I so rule. Quite apart from these letters it is apparent that petitioner has abandoned the vessel.

■ Because of the abandonment petitioner contends that pursuant to general maritime law, as recognized by sections 15 and 19 of the Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 409 and 414, it is not liable to respondent for any damage caused by the presence of the wreck. This would clearly be correct if the sinking were not wilful or due to negligence to which the owner was privy. See, e. g., City of Newark v. Mills, 3 Cir., 35 F.2d 110, certiorari denied 281 U.S. 722, 50 S.Ct. 237, 74 L.Ed. 1140;

In re Highland Nav. Corp., D.C.S.D.N.Y., 24 F.2d 582, affirmed 2 Cir., 29 F.2d 37. Respondent, however, contends that the principle which permits avoidance of liability by abandonment is exactly the same as that which underlies the Limitation of Liability Act, 46 U.S.C.A. § 183 (which, in effect, permits abandonment to the injured parties), and should extend no further. See Hagan v. City of Richmond, 104 Va. 723, 733-734, 52 S.E. 385, 389-390, 3 L.R.A.,N.S., 1120; Robinson, Admiralty Law § 121 (1939). I confess this has considerable appeal. Certainly if an owner deliberately scuttled his vessel in an improper place in order to be rid of her, he would not be permitted to avoid liability by claiming abandonment. In re Eastern Transp. Co., D.C.D.Md., 102 F.Supp. 913, affirmed sub. nom. Ottenheimer v. Whitaker, 4 Cir., 198 F.2d 289. Why should it be any different if he was guilty of actionable negligence? It is not disputed, if the order denying limitation and exoneration was correct, that petitioner is liable for provable damages to the wharf and building. Similarly, the obstruction of navigable water alongside a wharf is an actionable tort to the wharfowner. Brayton v. City of Fall River, 113 Mass. 218; see The Irving F. Ross, D.C.D.Mass., 8 F.2d 313. I would not be impressed with the distinction, were it advanced, that the explosion damage to the building occurred prior to the abandonment, and the damage to the use of the wharf was due not to the sinking of the vessel, but to the continuing failure to remove it, and that after the vessel had been abandoned the petitioner no longer owned it, and therefore the duty ceased. This merely avoids the issue. The real problem is whether the owner can be said to have a right, once he has committed an actionable tort, to wash his hands of the instrumentality by which the tort was committed and thereby absolve himself of the damages flowing herefrom.

■ The only case which petitioner cites which affirmatively supports its position is The Utopia, [1893] A.C. 492 (P.C.), in which there is dictum, at p.

498, to the effect that "the owner of a ship sunk *whether by his default or not* (wilful misconduct probably giving rise to different considerations) has not, if he abandon the possession and control of her, any responsibility either to remove her or to protect other vessels from coming into collision with her." (Italics supplied.) However, it is questionable how much vitality this dictum retains in the English courts. In the case of Dee Conservancy Board v. McConnell, [1938] 2 K.B. 159 (C.A.), the court strongly questioned the correctness of the quoted passage from The Utopia, citing dictum to the opposite effect from The Crystal, [1894] A.C. 508, 516. In the Dee case the conservators of a navigable river and the owners of a wharf sued the owners of a ketch which had sunk by reason of the owner's negligence in such a manner as to obstruct navigation and block the wharf. Notwithstanding abandonment by the defendants, plaintiffs were allowed to recover the expenses of removing the ketch as "damages directly caused by the [defendants'] negligence." The court held that this result was not foreclosed by the decision in The Crystal, supra, which had held that the special statutory right of harbor authorities to recover the cost of wreck removals was limited by the owner's right to abandon. This statute was held to be merely supplementary to "common law" rights based upon negligence, which rights were not affected by abandonment. See also The Stonedale No. 1, [1954] 2 All Eng.R. 170 (C.A.), aff'd, [1955] 2 All Eng.R. 689 (H.L.); The Ella, [1915] P. 111; The Chr. Knudsen, [1932] P. 153. There are no American cases to the contrary, but rather a number which appear, in passing, to recognize the principle that loss without fault on the owner's part is a prerequisite to the termination of liability by abandonment. See, e. g., In re Highland Nav. Corp., supra; Orrell v. Wilmington Iron Works, Inc., D.C.E.D.N.C., 89 F.Supp. 418, 423–425, affirmed in part, reversed in part 4 Cir., 185 F.2d 181; Winpenny v. City of Philadelphia, 65 Pa. 135;

Hagan v. City of Richmond, supra. Without ruling on their relevancy, I also find nothing to the contrary in the statutes of Massachusetts, G.L. c. 91, §§ 38–45, 49. I rule that petitioner's abandonment does not defeat respondent's claim.

■ A number of questions arise with respect to damages. The wreck has not yet been removed. If this had been done forthwith, the cost would have been $11,200. Today it would cost $14,500. When vessels tie up at the dock respondent charges $1 a day for the space now preempted by the wreck. Respondent has a good deal of other space, and there was no evidence as to the demand for this particular space, or of the amount of custom, if any, respondent has had to turn away. On the other hand, this is a busy location. But the ceiling on this loss of use is $365 a year. Respondent further claims that the presence of the wreck causes inconvenience to other users of the dock. This I do not doubt, but in the absence of evidence that respondent lost any business as a result of this inconvenience, it is difficult to assess any monetary damage. The same applies to the annoyance, and possible inconvenience, that the presence of the wreck causes respondent.

■ The respondent has a 20 year lease on this property, commencing October 1, 1958, and subject to renewal. I doubt that if respondent were awarded $14,500 (or $11,200, subject to supplement by itself) it would make the "investment" of removing the wreck in order to clear space of a monetary worth, at the most, of $365 a year. Simple interest on $14,500 would approximate twice that amount, and there would still be the principal left. I find respondent will be adequately compensated for the loss of use if paid a sum approximating the present discounted value of $350 a year for 20 years at 5 per cent, or $4,600. But since respondent may be serious as to the extent of the intangible damages it suffers from the presence of the wreck, and may really intend to have the wreck removed, I will make the following order.

Within 30 days after the date of this opinion respondent may file a disclaimer and election, disclaiming the monetary damages awarded herein for the loss of use of its wharfage space, and electing to remove the wreck, instead. If respondent shall have removed the wreck within six months of the date of its election, or caused same to be done, the cost to it of doing so, not to exceed $11,200, shall be paid to it by petitioner. I select this lower figure because respondent could have removed the wreck in 1957, and since it chose not to do so, any additional damages, including avoidable loss of use, cannot be passed on to petitioner. I will not enter a ·final judgment until said 30 days have passed, and will then enter it in one form or the other. If respondent elects to remove the vessel, and thereafter there is an appeal, I will extend the six months.

■ The rest of respondent's claim is for physical injury to its premises caused by the explosion. The pier to which the Demand was made fast was constructed of granite and concrete. Attached to the outside and running down into the water was a fender composed of timbers bolted to the pier and to each other. The explosion charred or scorched the outer surface of this framework for a considerable distance. The court took a view. The timbers were 12″ and 14″ thick, and the maximum penetration of the damage was but 1/2 to 3/4″, and not always that much. The timbers were not new. No repairs have been made. In my opinion the damage does not materially affect either the strength, utility or the life expectancy of any member. If this were yacht work, where appearance, or rub-off, would be of importance, that damage might be claimed, but all of these timbers are markedly oil-stained from the character of the water in this locality, and no fishing vessel is going to be injured, or its owners offended, by a little charring coming off on its rubstrake. The only testimony offered as to the measure of damages was the cost of replacement of the entire framework. This could not possibly be the correct measure of damages. Nominal damages are more appropriate.

■ The next item relates to windows. All of the windows (30), including the frames, were blown out and damaged beyond repair by the explosion. I find that the fair cost of replacement was $7,881.50, which includes $584 for painting. There is no evidence as to the age or condition of the windows, other than. that the paint was weathered. They had wooden frames. Obviously these were not brand new, but the mere fact that the paint was weathered does little to tell the amount of deterioration of the wood itself prior to the accident. I believe it fair to assume, in the absence of evidence, that even wooden window frames normally last the useful life of a building. Accordingly, I find the cost of replacement, other than paint, which was needed anyway, to be the proper measure of the damage.

■ The next item relates to the outside of the west wall of the building. This wall was constructed of poured concrete over structural steel. The building is 35 or more years old. I find on the basis of petitioner's expert that buildings of that period and type of construction progressively crack and "spall," the latter meaning that pieces of concrete fall off. Many substantial cracks existed prior to the accident. Possibly a few more were added by the force of the explosion, but, if so, I cannot determine how many. The principal effect of the explosion was to shake off a large number of spalls. The breaking off of many of these was merely accelerated by the explosion. I cannot find how many new spalls, if any, were originated. The wall was repaired, and the fair cost of doing so was $10,681. This put the wall in much better shape than it was prior to the accident. No breakdown or segregation was offered, and respondent frankly admits that it has no evidence available as to what part of this bill was attributable to conditions existing before the accident, and what to conditions caused by the explosion. If petitioner has no such evidence available, expert or otherwise, I

do not see on what basis the court can exercise any judgment. Respondent says that it could "get along" with the wall as it was before the accident, and that the necessity of repair resulted solely from the explosion. Even if I were so to find it is obvious that with the progressive deterioration, which was already well under way, the wall was going to need substantial repair before long. I find that the date of any further repair has been now indefinitely postponed. I know of no principle of law which would make petitioner liable for the full cost of repair of a wall when all it did was to accelerate the inevitable. Respondent has failed in its burden of proof. I do not know how much physical damage was caused to the wall, and a fortiori, I cannot place any dollar sign upon the loss.

Respondent suggests the burden of separating this damage was on petitioner. If ever that might be so in such a case, which I do not decide, I would not impose such a burden where respondent repaired the wall before it notified petitioner of any claim for damages. I do not find, contrary to the case of the windows (in which I placed no such burden on petitioner), that petitioner was notified by the open circumstances. If a burden of proof is to be shifted because of unusual circumstances, cf. Gomes v. Eastern Gas & Fuel Associates, D.C.D.Mass., 127 F.Supp. 435, 438, the party who wishes to make such a claim must be particularly diligent to place no obstacle in the path of the party so burdened. This principle I am advancing is perhaps a species of laches.

Respondent claims certain damages inside the building. I find that the asbestos insulation on an ammonia pipe immediately below some of the broken windows was shaken loose so as to require replacement. The cost of doing this was $1,496. However, perhaps even more so than in the case of the wall, this insulation had substantially deteriorated prior to the accident, and, again, all that petitioner did was to accelerate the date of replacement. I was shown a piece of this insulation. Its deterioration was such that I do not make the same assumption of longevity I did with respect to the window frames, but quite the reverse. I experience the same inability of determining damages that I do with the outer wall.

Finally, respondent claims that following the explosion certain cracks and bulges appeared in the insulating lining of the freezing rooms on the inside of the west wall. The evidence on this is very meager. There was no expert testimony conecting it up with the explosion, but even if that could be overlooked, the evidence that this damage did not exist prior to the accident came only from a statement of a deceased witness made to an adjuster for respondent's insurance carrier. It has appeared in other connections that respondent's damage claims to this adjuster, and elsewhere, were more favorable to itself than they should have been. It may be that this bulging was the result of prior leaks through a wall which was already full of cracks, or due to some other cause. If respondent had no witness who could come to court and subject himself to cross-examination at least as to when this damage occurred, or any expert testimony, I am not satisfied to make a finding in its favor simply on this self-serving extrajudicial statement.

It follows that respondent Boston Fish Market Corp. is entitled to $4,600 for the loss of use of its pier, and $7,300 for the breakage of its windows. The first figure includes an interest calculation. The other is unliquidated and I award no interest as a matter of discretion. The damages recoverable by the other respondents have already been stated.