**BP EXPLORATION & OIL, INC., Plaintiff,**

v.

**MORAN MID–ATLANTIC CORP., et al., Defendants.**

**No. CIV. A. 97–5059.**

United States District Court, D. New Jersey.

June 28, 2001.

Stuart M. Goldstein, Lynne M. Parker, Hollstein Keating Cattell Johnson & Goldstein P.C., Marlton, NJ, Attorneys for Plaintiff.

John Mattioni, Paul A. Kettunen, Mattioni LLP, Westmont, NJ, Attorneys for Defendants.

## CONCLUSIONS OF LAW

RODRIGUEZ, District Judge.

### I. Introduction

A more detailed discussion of the facts of this case can be found in this Court's Findings of Fact, issued even date. For the purposes of understanding these Conclusions of Law, this brief recitation of the facts will suffice.

On or about 6:00 A.M. on April 3, 1994, the GRACE MORAN, a tugboat owned and operated by defendants, Moran Mid–Atlantic Corp., and Moran Towing Company (collectively "Moran"), with its mate on watch asleep in the wheelhouse, crashed through a portion of the outer dock and walkway structure of a dock facility on the Delaware River in Paulsboro, New Jersey, owned and operated by BP Exploration & Oil, Inc. ("BP"). The tug then proceeded to crash into and through the inner walkway and associated piping and continued through this area until it ran aground on the shoreline. This is referred to herein as the Incident.

At the time of the Incident, Frank Auerswald, the mate, was on watch at the wheel

of the GRACE MORAN. He had been at watch for more than twelve hours in the twenty-four period preceding the Incident, though not all of that time on watch had been spent at the wheel. He was still on watch at the time of the Incident because he had chosen to let the captain, Joseph Killian, remain sleeping. Neither Auerswald nor Killian knew the working hour requirements, under federal law, for time spent on watch. Moran had no official policy in place regarding the number of hours worked by the captain or the mate. Instead, Moran relied upon the captain to conform to federal law, but did not provide training on federal law to the captains.[1]

In the Findings of Fact, this Court examined BP's damages as a result of the Incident. BP claimed to have incurred $154,931.99 in Emergency Response Costs, which included charges for, among other items, oil product loss, security, emergency contractors, and two surveys (a damage survey and a condition survey) by Hudson Engineers. BP was not entitled to a claimed expense of $5,774.88 for use of its equipment.

After the crisis had ended, portions of some of the pipes at the dock facility were determined to have been destroyed. Additionally, a portion of the Outshore Walkway, a portion of the Inshore Walkway, and Barge Cluster Six had been destroyed. BP claimed $228,750.00 for damages to the walkways, $4,367.00 for damages to the electrical components, $307,872.00 for damage to the pipelines, $9,500 for permit applications, $6,190.00 for permit fees, $14,127.00 for bid package preparation, and $800.00 for a material take-off estimate.

This Court determined that the Outshore Walkway had exhausted 12% of its useful life, the Inshore Walkway and Barge Cluster Six had exhausted 80% of their useful lives, that certain pipelines had been abandoned prior to the Incident, and that the remaining five pipelines had exhausted 44% of their useful lives.

While BP replaced the portion of the Outshore Walkway that was destroyed in the Incident, it did not replace the destroyed portion of the Inshore Walkway or Barge Cluster Six. Instead, a new portion of Outshore Walkway was added to the dock facility. The five pipelines that were not abandoned were replaced by BP, though in a different configuration.

Early on, the parties were all involved in the emergency response to the Incident and in the assessment of the damages. Soon, the parties developed some fundamental disagreements, and the assessments and negotiations dragged on until BP filed this suit in October 1997. While Moran eventually conceded liability for the Incident, the parties were unable to agree on damages. A bench trial on the issue of damages was conducted from February 24, 2001 to March 13, 2001. The following are the Court's Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

## II. Jurisdiction

1. BP is an Ohio Corporation, with a principle place of business in Cleveland, Ohio.

2. Moran Mid–Atlantic Corporation was at the times relevant hereto a Delaware Corporation, with a principle place of business in Baltimore, Maryland.

3. Moran Towing of Pennsylvania was at the times relevant hereto a division of Moran Mid–Atlantic Corporation, with a

---

1. Additionally, Auerswald was taking medications that have a possible side effect of causing somnolence. This Court determined, however, that the medications did not contribute to the accident.

principle place of business in Philadelphia, Pennsylvania.

4. This Court has jurisdiction over this civil admiralty claim pursuant to 28 U.S.C. § 1333. Venue is proper in this Court.

### III. Conclusions of Law

#### A. Compensatory Damages

5. BP and Moran have argued extensively on the law of damages in admiralty cases. This Court notes that it would have helped the parties to prepare their trial presentations if they had moved this Court, prior to trial, for an interpretation of the conflicting case law on this topic. It would also have facilitated settlement discussions. This was not done.

6. The general rule for recovery of damages due to the negligence of others in admiralty cases is *restitutio in integrum;* the damaged party is entitled to be put in as good a position pecuniarily as he was in prior to the damage to his property occurring. *The Baltimore,* 75 U.S. (8 Wall.) 377, 385–86, 19 L.Ed. 463 (1869); *Standard Oil Co. v. S. Pac. Co.,* 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925).

7. If the plaintiff suffers a total loss, either actual or constructive, he or she may recover the value of the property lost just before the damage. If there is not a complete loss and repairs are feasible, the cost of repair is the measure of damages. But, if those costs exceed the value just before the damage, then the plaintiff is limited to the value just before the damage. *See Standard Oil,* 268 U.S. at 155–56, 45 S.Ct. 465; *Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.,* 191 F.3d 633, 635–36 (5th Cir.1999); *Orange Beach Water, Sewer, and Fire Prot. Auth. v. M/V Alva,* 680 F.2d 1374, 1383–84 (11th Cir.1982); *Bunge Corp. v. Am. Commercial Barge Line Co.,* 630 F.2d

1236, 1241 (7th Cir.1980); *Hewlett v. Barge Bertie,* 418 F.2d 654, 657 (4th Cir.1969); *The Manhattan,* 85 F.2d 427, 428 (3d Cir. 1936); *Pillsbury Co. v. Midland Enters.,* 715 F.Supp. 738, 764 (E.D.La.1989).

8. It does not matter that a plaintiff chooses to build a different facility instead of replacing a facility with identical property, a defendant is still liable for the damages incurred by the destruction of the original facility. *See Bunge Corp.,* 630 F.2d at 1241–42.

9. The burden is on BP to prove the extent of its damages, including the actual value of any item damaged at the time just prior to damage. *See Servicios–Expoarma, C.A. v. Indus. Mar. Carriers, Inc.,* 135 F.3d 984, 994 (5th Cir.1998); *Pizani v. M/V Cotton Blossom,* 669 F.2d 1084, 1088 (5th Cir.1982); *Pinto v. M/S Fernwood,* 507 F.2d 1327, 1331 (1st Cir. 1974); *O'Brien Bros. v. The Helen B. Moran,* 160 F.2d 502, 504–05 (2d Cir.1947); *In re Boat Demand, Inc.,* 174 F.Supp. 668, 673 (D.Mass.1959).

10. If Moran asserts that value is less than the cost of repairs, Moran has the burden of establishing that fact. *See Hewlett v. Barge Bertie,* 418 F.2d 654, 657 (4th Cir.1969).[2]

11. Even though a defendant has the burden of demonstrating that a plaintiff could have mitigated its damages, this "does not affect the ordinary rule that an injured party has the burden of proving the damages he has actually suffered." *See O'Brien Bros.,* 160 F.2d at 504.

12. In a recent article in the Oregon Law Review, the author described two conflicting fundamental principles of remedies. *See* James E. Beard, Comment, *A Tale of Boats, Bridges, Barges, and Automobiles: Restoring the Injured Party's*

---

**2.** This Court noted that Moran failed in this burden in the Findings of Fact.

*Rightful Position in Cases Involving Loss of Used Property,* 76 Or. L.Rev. 1049 (1997).

> The first fundamental rule of compensatory damages is to restore the injured party, as nearly as possible, to her rightful position. . . . The second fundamental principle of compensatory damages is that, while the injured party is entitled to be restored to her rightful position, the wrongdoer is usually entitled to have plaintiff made whole in the least expensive way.

*Id.* at 1050–51; *see also* Michael A. Snyder, *Maritime Collision Damage to Vessels and Fixed Structures,* 72 Tul. L.Rev. 881 (1997). Here, BP argues that the first principle, and BP's favored cases, militate against a reduction from any damage award for depreciation or betterment. Moran, of course, cites only cases that apply depreciation and betterment, arguing for the second principle.

13. In *J.W. Paxson Co. v. Board of Chosen Freeholders,* 201 F. 656 (3d Cir. 1912), the Third Circuit addressed the appropriate damages after a tug crashed into a draw bridge, knocking a piece of the bridge into the river. It was determined that a span of the bridge and a fender needed to be replaced. While the court allowed the amount of damages awarded to replace the fender to be reduced for depreciation, the plaintiff was allowed the full replacement cost for the span of the bridge.

> The plaintiff was compelled, by the negligence of the defendant, to build a new structure, which, as a new structure, was possibly, though not certainly, more valuable than the old one. But the old structure sufficed for the purposes of the plaintiff, and the plaintiff was damaged by being compelled to procure a new structure in place of the old one, for the contract price of which it was obliged to pay. The sufferer by the negligence of the defendant cannot be compelled to perform the impossible task of recreating the old span, without buying a new one, or make a nice computation of the difference in value between the old one and the new. The plaintiff did not need a new span. The old one was sufficient, and the [plaintiff] was damaged by being compelled to incur the cost of the new one.

*Id.* at 663; *see also* 17 C.J. *Damages* § 188 (1919) (citing *Paxson* for proposition that destruction of a structure that served a particular use results in the measure of damages being replacement cost without applying the "new for old" rule).

14. The *Paxson* court did not explain why, in this case, the "new for old" rule should not be applied. This rule avoids giving a windfall to a plaintiff by replacing old and depreciated equipment with new equipment. *See Oregon ex rel. State Highway Comm'n v. Tug Go–Getter,* 468 F.2d 1270, 1273 (9th Cir.1972). In *Tug Go–Getter,* a tug had collided into a pier that was connected to a bridge. The court took no reduction from the plaintiff's damages for depreciation of the pier or its individual parts. The court found that the pier was an integral part of the bridge and that the repair or replacement of the pier added no substance to the overall value of the bridge. That is, the life expectancy of the bridge was not extended by the replacement of an old pier with a new one.

15. In addition to citing *Paxson,* the *Tug Go–Getter* court cited *United States v. Ebinger* in support of its determination. *See Tug Go–Getter,* 468 F.2d at 1274 (citing *United States v. Ebinger,* 386 F.2d 557 (2d Cir.1967)). In *Ebinger,* a contractor working on a water tower at the top of a government building negligently caused the tower to burn, necessitating a new tower to replace it. The appellate court

reasoned that the rule that a plaintiff can hold its loss to the value of property before damage by abandoning rather than replacing it does not apply when damaged property is an essential part of a larger whole. The water tower was an integral part of the building air conditioning system. A defendant does not get a credit because a new piece of property was acquired if that was the cheapest course available. The court noted, however, that this exception might not apply where the damaged part was scheduled for early replacement, long before the useful life of the whole unit. The water tower was probably good for another twenty to twenty-five years. Even though the whole unit had a "somewhat longer useful life," "any increment in value by avoiding the possible need to replace the water tower a quarter of a century hence would be small and speculative." *Id.* at 561. The contractor was allowed to reduce the damages by deducting the amount of maintenance costs that would be saved by the government.

16. There is further support for this position. As far back as 1869, the United States Supreme Court addressed the proper measure of damages in admiralty where two vessels collided and the nonculpable vessel sinks. *See The Baltimore,* 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869). In dicta, the Court explained the general rule of *restitutio in integrum,* which is the general rule followed by the courts in admiralty.

> [T]he damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred; and in respect to the materials for the repairs the rule is that there shall not, as in insurance cases, be any deduction for the new materials furnished in the place of the old, because the claim of the injured party arises by reason of the wrongful act of the party by whom the damage was occasioned, and the measure of the indemnification is not limited by any contract, but is coextensive with the amount of the damage. Such repairs, in consequence of a collision, may enhance the value of the vessel and render her worth more than she was prior to the accident, and in that state of the case the rule in insurance cases is that one-third of the value of the new material is deducted, because the new material is more valuable than the old, *but the rule is not so where the repairs are required in consequence of a culpable collision.*

*Id.* at 385–86 (footnotes omitted) (emphasis added); *see also The Atlas,* 93 U.S. 302, 23 L.Ed. 863 (1876) ("[T]he sufferer is entitled to complete indemnification for his loss, without any deduction for new materials used in making repairs, as is prescribed in the law of marine insurance."). *But see Tug Go–Getter,* 468 F.2d at 1273 n. 2 (explaining that the dicta in *The Baltimore* has been disfavored by recent district court decisions and that the "new for old" rule is applied in negligence cases).

17. There are numerous other cases that apply this exception to the "new for old" rule. *See, e.g., Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir. 1994) (no depreciation where useful life of property as existed before collision is not extended; when the whole pipeline eventually needed replacing, these pieces would also need replacing); *Weyerhaeuser Co. v. Atropos Island,* 777 F.2d 1344, 1352 (9th Cir.1985) (no depreciation should be deducted where nothing of substance is added to the overall value of a structure, but should be deducted for damage to a non-integral part of the structure); *Shepard S.S. Co. v. United States,* 111 F.2d 110, 113 (2d Cir.1940) (liable party is not given credit for the difference between the value of the ship after repair and the value prior

to collision; but do not apply this rule where the part replaced was not in good condition); *Paktank Corp. v. M/V M.E. Nunez*, 35 F.Supp.2d 521, 530 (S.D.Tex. 1999) (no deductions for depreciation if the repairs do not extend a structure's life or enhance its value).

18. These principles, to a certain degree, comply with common sense. The law on damage to an automobile provides a clear analogy. It is widely understood that, if the damage to an automobile in an accident exceeds the "book value" of the automobile, then the plaintiff is entitled only to the "book value" of the automobile as recovery. If the cost of the repairs is less than the "book value" of the automobile, then the plaintiff is entitled to the cost of the repairs. The damages are not apportioned as to each individual piece of the automobile that may need to be replaced. That is, a plaintiff need not demonstrate the expected usefulness of the hood of the car as opposed to the life expectancy of the carburetor as opposed to the age of the battery as opposed to the depreciation rate for the windshield. Each piece is an integral part of the entire automobile and the plaintiff's recovery is determined on the "book value" of the entire automobile.

19. Moran directs this Court's attention to a line of cases that deduct from a plaintiffs' recoveries amounts for depreciation and betterment. *See, e.g., Midwest Indus. Painting of Fla., Inc. v. United States*, 4 Cl.Ct. 124 (Cl.Ct.1983) (certain seals that were replaced had exceeded their useful life and previously been scheduled for early replacement, thus no recovery was allowed for replacement of those seals); *Bunge Corp. v. Am. Commercial Barge Line Co.*, 630 F.2d 1236, 1242 (7th Cir.1980) (proper measure of damages is "the replacement costs less depreciation"); *Freeport Sulphur Co. v. The S/S Hermosa*,

526 F.2d 300, 305 (5th Cir.1976) (if the property value is enhanced, the increase in value is deducted from the plaintiff's recovery); *The Manhattan*, 85 F.2d 427, 428 (3d Cir.1936) (the obligation "is not to supply a new vessel in place of an old one, nor one worth $1,000,000 in place of one worth $300,000"); *In re Crounse Corp.*, 956 F.Supp. 1377, 1381–82 (W.D.Tenn.1996) (under "new for old" rule, the court must determine whether repair or replacement adds value or extends useful life; *Paxson* is exception to betterment where, under totality of the circumstances, it is inequitable to compel an injured party to replace property because of tortfeasor-created crisis); *Pillsbury Co. v. Midland Enters.*, 715 F.Supp. 738, 764 (E.D.La.1989) (the "new for old" rule applied, so the injured party need only be restored to his condition immediately prior to the accident; court should take appropriate reduction where useful life is extended); *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F.Supp. 705, 709–10 (E.D.Pa.1962) (reducing damages because of use of half of its useful life prior to accident and further reducing damages because the new dolphin was bigger and more stable); *In re Boat Demand, Inc.*, 174 F.Supp. 668, 672–73 (D.Mass.1959) (plaintiff's damages should be reduced because he ended up better off than he was prior to the explosion); *Patterson Oil Terminals, Inc. v. The Port Covington*, 109 F.Supp. 953, 955–56 (E.D.Pa.1952) (considering the useful life expended prior to the collision and stating that plaintiff "can ask for no more").

20. The automobile analogy above is also helpful here. A plaintiff gets the "book value" of the automobile, not the cost of new automobile. Thus, in the automobile analogy, the depreciation is already included in the "book value." Courts do not, generally, further depreciate individual parts.

21. Against this backdrop, it is clear that a federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case. *See, e.g., Standard Oil Co. v. S. Pac. Co.,* 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925) ("It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."); *The Atlas,* 93 U.S. 302, 312, 23 L.Ed. 863 (1876) ("Disasters of the kind occur from different causes and under very different circumstances, and the rules of admiralty law applicable in the determination of such controversies vary to meet the varying circumstances which give rise to the accident."); *Pizani v. M/V COTTON BLOSSOM,* 669 F.2d 1084, 1089 (5th Cir.1982) (finding that a federal court sitting in admiralty has equitable powers, thus the common law was not controlling); *Gateway W. Ry. Co. v. Am. River Transp. Co.,* 887 F.Supp. 201, 202 (C.D.Ill.1995) ("[A] court sitting in admiralty is privileged to exercise flexibility and award what is fair" (quotations and citations omitted); "A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise general equity jurisdiction." (quotations and citations omitted)).

22. This Court, sitting in admiralty as a court of equity, finds that the applicable law of damages in admiralty cases involving the collision of a vehicle with a stationary object, in this case a dock facility, is that, where the destruction does not result in a total loss, actual or constructive, and where repairs are not actually made in-kind, the estimated cost of in-kind replacement is the proper measure of damages. To the extent that the damage is to an integral part of the dock facility and the repairs will not enhance the value of the dock facility, there is to be no depreciation for the individual pieces. To the extent that the damage is to a non-integral or separate part of the facility, the plaintiff's recovery should be reduced in accordance with the principles of depreciation and betterment.

23. This Court finds that the pipelines at the dock facility are an integral part of the facility. The entire purpose of the dock facility is to transfer product from on-land tanks to boats through a pipeline. The dock facility could not function without the pipelines to move the product from the storage tanks ashore to the vessels at the dock facility. Replacement of segments of a line do not enhance the overall value of the dock facility or extend the useful life of the facility. If the remaining segments of each pipeline give way, it will be of no consequence that one segment of the line was replaced more recently. Accordingly, no reductions in a damage award to BP will be made for depreciation of the pipeline segments damaged in the Incident or for betterment because one portion of the pipeline is newer.

24. For these same reasons, even if the pipelines had not been an integral part of the dock facility, there would be no depreciation applied to Plaintiff's damages. Similar to the findings in *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500 (5th Cir. 1994) when the entire pipeline is eventually replaced, it is unlikely that these pieces of pipes would be left for replacement even further in the future and, if that were the course of action, any savings would be *de minimis.*

25. Barge Cluster Six, the Inshore Walkway between Berth Four and Berth Six, and the Outshore Walkway between

Berth One, Cell One and Berth Two, Cell Four are not an integral part of the dock facility. While they are used in the operation of the dock facility, each piece is individually replaceable and not critical to the function of the dock facility as a whole. Any number of options are available to BP to ease traversing to the vessels.

26. The most obvious evidence of the lack of integration of the damaged portion of the Inshore Walkway is the failure of BP to replace it. BP had other options available to it and other configurations it could choose, as it did. Berth Two could still be accessed by the Berth Two Approachway.

27. As to Barge Cluster Six, barge clusters were individual items with their own intrinsic and financial value. They could be individually replaced or taken out of service without affecting the overall value or useful life of the dock facility.

28. The damaged portion of the Outshore Walkway was also not an integral part of the dock facility. This portion had been added approximately six years prior to the Incident, and the dock facility had been completely functional prior to that addition. While it made travel from Berth One to Berth Two more convenient, it was not such an integral part of the facility that its destruction left the dock facility unable to function as a dock facility, as with the damaged pipelines.

29. Accordingly, this Court will apply depreciation to the damages to which BP is entitled to recover for the damages to portions of the Inshore Walkway, portions of the Outshore Walkway, and Barge Cluster Six.

30. BP obtained an in-kind estimate to replace the piping to where it had been just prior to the accident; and Moran's expert reviewed that estimate and provided his own. The Hudson estimate, for BP, was $307,872.00; the estimate by Moran's expert, F. Xavier McGeady, was $286,006.00.

31. This Court explained in its Findings of Fact that the pipelines not in use at the time of the Incident had been abandoned. Thus, the Incident simply "encouraged the inevitable," and BP is not entitled to recovery for the damages to those pipelines. *See In re Boat Demand, Inc.*, 174 F.Supp. 668, 673 (D.Mass.1959).

32. BP's estimate to replace the five lines in use at the time of the Incident was $228,295.96. The Court arrived at this number by using the five amounts specified for each of those five pipelines, totaling $128,832.00, which was 73% of the cost of all of the pipes combined, which was $176,092.00. This Court then added 73% of the remaining costs (73% of $136,252.00 is $99,463.96), for things such as hydrostatic testing, radiography, etc., and totaled the two numbers, which is $228,295.96. Applying these same calculations to McGeady's estimate, the total is $205,942.64 (i.e., $141,142.00 for the pipe plus $64,800.64 (73% of $88,768.99) for related costs). Considering all of the evidence, this Court finds that $210,000.00 is adequate compensation to BP for the piping replacement. One of the key considerations was McGeady's explanation for a lower contingency factor because of the scrupulous detail in the bids prepared by Hudson.

33. As described above, the pipelines are an integral part of the facility and their replacement will add no value or useful life to the facility. "The old [pipelines were] sufficient, and [BP] was damaged by being compelled to incur the cost of [the] new one[s]." *See J.W. Paxson Co. v. Bd. of Chosen Freeholders*, 201 F. 656, 663 (3d Cir.1912). Thus, BP is entitled to the complete $210,000.00.

34. The Outshore Walkway between Berth One, Cell One and Berth Two, Cell Four was estimated by Brenneman for in-kind repair at a cost of $67,650.00. Moran's expert, McGeady, concurred in the estimate. This portion of the Outshore Walkway was, in fact, replaced. The billing for parts and labor of this work was joined with the billing for part and labor relating to the installation of a new portion of Outshore Walkway connecting Berth Two, Cell Four with Berth Two, Cell Three. The total actual cost for both sections was $244,975.00, whereas the estimate for both these portions of the Outshore Walkway had been $218,850.00. Thus, the actual repair costs exceeded the estimate by $26,125.00.

35. Because the costs to repair the Outshore Walkway between Berth One, Cell One and Berth Two, Cell Four was only 31% of the original estimate, this Court finds that 31% of the difference between the estimate to repair both portions of the Outshore Walkway and the actual price paid is attributable to the repair and reinstallation incurred in the Outshore Walkway between Berth One, Cell One and Berth Two, Cell Four. That figure is $8,098.75. Thus, the costs to actually replace in kind the Outshore Walkway between Berth One, Cell One and Berth Two, Cell Four was $75,748.75 ($67,650.00 plus $8,098.75).

36. McGeady stated that the Outshore Walkway had expended 12% of its useful life and that BP's recovery should be reduced by 12%. BP presented no evidence contradicting this rate of depreciation. Accordingly, this Court will depreciate $75,748.75 by 12%, and BP will be awarded $66,658.90 as damages for the destruction of this portion of the Outshore Walkway.

37. The Brenneman estimate to replace in-kind the portion of the Inshore Walkway destroyed in the Incident was $140,670.00. McGeady concurred on all of the estimated costs. Thus, this Court finds that it would have cost BP $140,670.00 to replace, in-kind, the Inshore Walkway from Berth Six to Berth Four.

38. The parties, of course, do not agree on any rate of depreciation to be taken against the Inshore Walkway. McGeady estimated that the Inshore Walkway has exhausted at least 80% of its useful life. Stephen M. Olko found that, because there was maintenance and upkeep of the Inshore Walkway, only 30% of the useful life had been exhausted. Olko's estimate is imprecise, and fails to cite to the specific maintenance acts that have extended the useful life to such a great extent. This is even more clear when the Court considers that Olko did not find the 12% depreciation for the Outshore Walkway, based solely on years in existence versus useful life, to be unreasonable. This court finds McGeady's estimate more reliable. Indeed, under McGeady's estimate, the Inshore Walkway was between forty-three and sixty-four years old. This would mean that the Inshore Walkway had exhausted anywhere from 86% to 100% of its useful life. Considering all of the other factors, including maintenance, McGeady lowered this figure to 80%. This court finds that BP's recoverable damages for in-kind repair to the Inshore Walkway between Berth Four and Berth Six should be reduced by 80%. Accordingly, the amount recoverable by BP is $28,134.00.

39. The Brenneman estimate for in-kind repairs to Barge Cluster Six was $20,430.00. Again, McGeady concurred in this figure, and the disagreement comes down to the depreciation rate. For the same reasons that this Court used McGeady's depreciation rate for the Inshore Walkway, this Court finds McGeady's depreciation rate, 80%, for Barge Cluster Six is more reliable than

Olko's rate of depreciation. Thus, BP will be allowed recovery of $4,086.00 for in-kind replacement of Barge Cluster Six.

40. This Court finds that the estimated electrical costs of $4,367.00 was for work necessitated by the Incident. Because of the age of the electrical equipment being replaced or repaired, McGeady found that 12% of its useful life had been expended. Olko did not raise any objection to this depreciation figure. Accordingly, this Court will award BP 88% of $4,367.00, which is $3,842.96.

41. At trial, McGeady conceded that the following figures of BP were reasonable estimates: $9,500.00 for permit applications; $6,190.00 for permit fees; and $14,127.00 for preparation of a bid package. The actual material take-off estimate was $775.43. The total of these figures is $30,592.43. Because BP was only entitled to $402,721.86 of the $541,215.75 it would have cost to replace these items in-kind, BP is entitled only to 74% of these other, reasonable, costs. *See Pillsbury Co. v. Midland Enters.*, 715 F.Supp. 738, 768–69 (E.D.La.1989). Thus, this Court will award BP $22,638.40 for the permit applications, permit fees, preparation of bid package, and material take-off estimate.

42. The emergency response costs incurred by BP are recoverable to the extent that those costs were reasonable. *See Marine Sales & Serv., Inc. v. Greer Steel Co.*, 312 F.Supp. 718, 723 (N.D.W.Va. 1970). If Moran contends the costs were unreasonable, it must demonstrate that BP's decision were "palpably" erroneous. *See Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 291 (2d Cir.1961).

43. This Court finds BP's claimed costs incurred in emergency response costs are reasonable except, for the reasons stated in the Findings of Fact, the claimed cost for equipment. BP owned the equipment for which it wants to recover rental value

and presented no reliable evidence to demonstrate this actual cost. This Court will award BP the following amounts for emergency response costs:

| | | |
|---|---|---|
| Oil Product Loss | $ | 1,796.82 |
| BP Employees Time | $ | 17,008.50 |
| BP Equipment | $ | 0 |
| Stanley Smith Security | $ | 805.50 |
| Emergency Contractors: | | |
| Brenneman | $ | 55,357.72 |
| Rossi | $ | 13,260.77 |
| Rowson | $ | 1,994.93 |
| Emergency Environmental | | |
| Services | $ | 5,557.24 |
| Hudson Engineers: | | |
| Damage Survey | $ | 38,436.09 |
| Condition Survey | $ | 14,939.54 |
| Total | $ | 149,157.11 |

44. Thus, BP is awarded compensatory damages totaling $484,517.37, broken down as follows:

| | | |
|---|---|---|
| Pipelines | $ | 210,000.00 |
| Outshore Walkway | $ | 66,658.90 |
| Inshore Walkway | $ | 28,134.00 |
| Barge Cluster Six | $ | 4,086.00 |
| Electrical Work | $ | 3,842.96 |
| Miscellaneous Costs | $ | 22,638.40 |
| Emergency Response Costs | $ | 149,157.11 |
| Total | $ | 484,517.37 |

## B. Punitive Damages

45. Punitive damages are discretionary with the trial court and may be awarded under limited circumstances in property damage cases. *Churchill v. F/V Fjord*, 892 F.2d 763, 772 (9th Cir.1988). To support a request of punitive damages, a plaintiff must demonstrate that the defendant acted willfully or wantonly, evidencing a reckless conscious disregard for safety. *The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456 (1818).

To recover punitive damages, the claimant must show deliberate wrongdoing—willful, wanton, grossly negligent, or unconscionable conduct so as to show a callous disregard for the rights of others—the equivalent of *mens rea* in criminal law. The theory of a punitive damage award is that the defendant has

committed the civil equivalent of a crime.

Thomas J. Schoenbaum, 1 Admiralty and Maritime Law § 5–17, p. 227 (2d ed.2001) (footnote omitted). Punitive damages are awarded only when the defendant's conduct is "so morally reprehensible that it implies a criminal indifference to civil obligations." *Leather's Best Int'l, Inc. v. M/V Lloyd Sergipe,* 760 F.Supp. 301, 313–14 (S.D.N.Y.1991).

 46. Where intentional or wanton conduct amounts to a conscious disregard of the rights of third parties, punitive damages are an appropriate available remedy. *CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 699 (1st Cir.1995). Exemplary damages have also been awarded when a vessel operator's acts or failures to act have recklessly increased the danger of disaster. *See Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1550 (11th Cir. 1987); *Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1347–48 (9th Cir.1987). Punitive damages may be proper when a vessel owner recklessly violate federal safety requirements. *Self,* 832 F.2d at 1550–51.

47. Under federal law, Auerswald and Killian were not permitted to work for more than twelve hours in a consecutive twenty-four hour period, except in an emergency; their work may have been divided into at least two watches. *See* 46 U.S.C.A. § 8104(g), (h) (West Supp.2000); *Watches,* 46 C.F.R. § 15.705 (2000); *Working hours;* 46 C.F.R. § 15.710 (2000).

 48. This Court finds that Auerswald worked more than twelve hours in the twenty-four hours preceding the Incident. BP requests punitive damages because Moran violated federal law by not having procedures in place by which it could ensure compliance with the federal work-hour limits. This Court, however, finds that this failure to provide such a procedure rises only to the level of ordinary negligence. Auerswald and Killian both had previously complained to Moran that their work schedule was heavy and requested that Moran change its procedures. Moran did not. There was not, however, the type of willful or wanton behavior that rises to the level of imposing punitive damages. Moran may not have been the most considerate employer, but there is no evidence in the record demonstrating that Moran made its choices in disregard for others or with contemplation that the policy may result in harm to others. Moran, generally, recommended that the captain and mate use the "six hour on/six hour off" schedule. Here, Auerswald and Killian chose not to use that method.

49. Furthermore, Auerswald chose not to waken Killian in the hours before the Incident, despite Killian telling him to, because he felt fine. This was a standard practice between the two men. This demonstrates to this Court that, even if Moran had a policy or procedure in place, Auerswald and/or Killian may not have followed it.

50. This Court will not assess any punitive damages against Moran.

### C. Prejudgment Interest

 51. "Throughout our history, admiralty decrees have included provisions for prejudgment interest." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 194, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). Since an injured party is to be completely compensated for its loss, the general rule in admiralty is that prejudgment interest should be awarded in maritime collision cases. *Id.* at 195, 115 S.Ct. 2091.

 52. Prejudgment interest is to be denied a maritime collision case only when there are "peculiar" or "exceptional" cir-

cumstances present which would make the award of prejudgment interest inequitable. *Id.; In re Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981). Peculiar or exceptional circumstances have been found to exist in cases where there was unreasonable delay in the prosecution of the litigation, bad faith estimate of damages, or no actual damage. *Id.*

53. No peculiar or exceptional circumstances are present in this matter. First, BP never delayed in the prosecution of its claim of actual damage, despite Moran's allegations to the contrary. Immediately following the Incident, BP took prompt steps to compile its damage claim, while attempting the expeditious repair and return to operation of the dock facility. A preliminary estimate of repair costs was provided to Moran as early as April 25, 1994. After the repairs were completed, the parties had limited discussions. A preliminary, but detailed accounting with supporting documentation was submitted to Moran in March 1995. In April 1996, an agreement tolling the running of applicable periods of limitations was entered into by BP and Moran, to allow an opportunity for further settlement discussions to take place. Upon request of Moran, a more detailed damage submission was compiled and forwarded to Moran in January 1997. BP ultimately filed suit in October, 1997. This history reveals that BP acted responsibly in pursuing its claim, post-Incident, especially given the magnitude of the claim.

54. BP's compensatory damage claim is not excessive given the damage it sustained. As early as days and then again less than a month after the Incident, BP had submitted an estimate of damage which was reasonably accurate. The damages were clearly not overstated and the estimates were made in good faith.

55. There are no circumstances which preclude BP from prejudgment interest on its damage award.

56. Prejudgment interest begins to run from the date the damaged party loses the use of its funds, e.g., from the time expenditures were actually made. *In re Bankers Trust,* 658 F.2d at 112. Where property is

"damaged but not put out of service interest is generally allowed only from the date of the expenditure for repairs, and not from the date of the collision. The award of interest is made as compensation for the deprivation of the use of money or property. . . ."

The Third Circuit's statement makes clear that where [property] *is* put out of service, interest should be allowed from the date of the accident to compensate for the deprivation of use of property. *In re Complaint of Tug Beverly, Inc.,* No. 92–0099, 1994 WL 194891, at *1 n. 1 (E.D.Pa. May 13, 1994) (citation omitted) (quoting *Utility Serv. Corp. v. Hillman Transp. Co.,* 244 F.2d 121, 125 (3d Cir. 1957)).

57. BP is entitled to prejudgment interest on its emergency response costs of $149,157.11 beginning on June 1, 1994, the date the expenses for these costs were finally paid.

58. As to the remaining items, Moran contends that BP is entitled to no prejudgment interest because BP never actually expended funds making all of the repairs. Even if this Court accepted Moran's argument, BP would be entitled to prejudgment interest at least on the work to the pipelines and the work to the Outshore Walkway between Berth One, Cell One and Berth Two, Cell Four as of the date of final payment, which was December 1, 1994.

59. As to the remaining items, BP may be entitled to prejudgment interest from the date of the Incident, as described above by the Eastern District of Pennsylvania in *In re Tug Beverly, Inc.* This Court finds, however, that BP used the funds it would have used to make the remaining in-kind repairs to make alterations to the dock facility. Thus, relying on its equitable powers, this Court finds that BP is entitled to prejudgment interest for all in-kind repairs from the December 1, 1994, the date on which BP has demonstrated it paid all expenses incurred in recreating a functional dock facility following the Incident.

60. The rate of prejudgment interest to be applied in admiralty and whether that interest is to be compounded is left to the sound discretion of the district court. *Mentor Ins. Co. v. Brannkasse,* 996 F.2d 506, 520 (2d Cir.1993); *Ameejee Valleejee and Sons v. M/V Victoria U.,* 661 F.2d 310, 313 (4th Cir.1981). Since prejudgment interest here is governed by federal common law, the courts are free to use their discretion to compensate a damaged plaintiff for the loss of use of money from the time its claim accrues. *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 194–96, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *Gorenstein Enters. v. Quality Care—U.S.A., Inc.,* 874 F.2d 431, 437 (7th Cir.1989). The court is not bound by rates of interest allowed under state law, *Ameejee Valleejee,* 661 F.2d at 313, but may employ prevailing commercial interest rates, *id.* at 314; *Cargill, Inc. v. Taylor Towing Serv., Inc.,* 642 F.2d 239 (8th Cir.1981). The setting of prejudgment interest at the average prime rate, compounded over the period of the loss, is both reasonable and appropriate and is the prevailing view for just compensation of a damaged plaintiff. *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111, 1116–17 (7th Cir.1998); *Transatl. Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94, 104 (2d Cir.1998); *Mentor Ins. Co. v. Brannkasse,* 996 F.2d 506 (2d Cir. 1993); *In re Oil Spill by Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992); *Nat'l Starch & Chem. Co. v. M/V MONCHEGORSK,* No. 97–1448, 2000 WL 1132043 (S.D.N.Y. Aug.9, 2000) (appropriate to use prime rate over the time period in question).

61. Consequently, and pursuant to these principles, BP is entitled to prejudgment interest on its damages at the average prime rate from 1994 to the date of this judgment, said interest to be compounded annually.