468 F.2d 1270
 STATE OF OREGON, By and Through its STATE HIGHWAY
COMMISSION, composed of Glenn L. Lackson, Kenneth
N. Fridley and David B. Simpson,
Plaintiff-Appellant,
v.
TUG GO-GETTER, her engines, apparel, equipment, et al.,
Defendants-Appellees.
Petition of SAUSE BROS. OCEAN TOWING CO., Inc., a
corporation, for Exoneration from or Limitation of
Liability, as the Owner of the Tug
Go-Getter, Petitioner,
 Nos. 25320, 25326 and 25342.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 7, 1972.
Rehearing Denied in Nos. 25320 and 25326 Oct. 5, 1972.
 
 William F. White (argued), of White, Sutherland & Gilbertson, Portland, Or., Lee Johnson, Atty. Gen., Portland, Or., George E. Rohde, Chief Counsel, Salem, Or., Samuel L. Holmes, of Angell, Adams & Holmes, San Francisco, Cal., for plaintiff-appellant.
 Johnathan A. Ater (argued), Carl R. Neil, of Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, Or., Walter H. Evans Jr. (argued), William D. Peek, Portland, Or., for defendants-appellees.
 Before CHAMBERS, HAMLEY and MERRILL, Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 The Coquille River empties into the Pacific Ocean at Bandon, Oregon. Some two miles upriver from Bandon, Bullard Bridge crosses the river. The bridge is owned, maintained and operated by the State of Oregon as part of the state's highway system. On October 4, 1966, the tug, Go-Getter, towing the barge, J. Whitney, was making an upstream passage through the draw span of Bullard Bridge when the starboard bow of the barge collided with the south channel pier of the bridge, damaging the web wall and upstream column of the pier. Repair expense in the sum of $191,938.70 was incurred.
 
 
 2
 Oregon brought this suit to recover damages. Named as defendants were the tug Go-Getter in rem; Sause Bros. Ocean Towing, Inc., owner of the Go-Getter; Captain Charles May, who was operating the Go-Getter at the time of the collision, and Olson Towboat Co., employer of May.[1] Judgment was entered against all parties. The court, 299 F. Supp. 269, found the defendants to represent two separate interests and divided damages between those two interests: Sause Bros. and the Go-Getter on the one hand; Olson Towboat and Captain May on the other.
 
 
 3
 Appeals have been taken by Oregon, by Sause Bros. and by Olson Towboat. Oregon protests the District Court reduction of its recovery by application of the rule against "new for old." Sause Bros. appeals the District Court's refusal to limit its liability to the value of the Go-Getter. Olson Towboat appeals the court's determination that Captain May's services aboard the Sause Bros. tug were within the scope of his employment by Olson Towboat.
 
 
 4
 On October 4, 1966, the barge J. Whitney, owned by Oliver J. Olson Co. entered Bandon Harbor en route to the Olson Co.'s lumbering operations at Rogge's Mill on the Coquille River. The barge was towed by the Jean Nelson, a tug owned by Olson Towboat Co., which company was in turn owned, to substantial extent at least, by the Oliver J. Olson Co. Since the Jean Nelson had too deep a draft to navigate the river, officials of both the Olson Co. and the Towboat Co. had arranged with Sause Bros. to have one of its towboats take the boat upriver to Rogge's Mill. In Bandon Harbor the change of tugs was made. Captain May of the Jean Nelson had formerly worked as a tugboat captain for Sause Bros. Before change of tugs was made Curtis Sause, vice-president of Sause Bros., instructed the captain of the Go-Getter that Captain May was to be in charge of taking the Go-Getter upstream. The crew of the Jean Nelson transferred from that tug to the barge, apparently in accordance with company practice, and also made passage upstream to aid in making the barge fast at its destination. Captain May was at the controls when the Go-Getter and barge passed under Bullard Bridge. Apparently the collision occurred when Captain May, inadvertently and unknown to himself, bumped into the clutch and knocked the vessel out of gear at a critical time during the maneuver.
 
 OREGON'S APPEAL
 
 5
 Bullard Bridge, built of concrete and steel, was completed in 1954. It had been in service for twelve years at the time of the collision. There was no evidence of deterioration (save as to the piers). Both the location and plans for the bridge had been approved by the United States Corps of Engineers in 1951. A minimum width of seventy-five feet between channel piers was specified in order to accommodate passage of vessels. Notice of application for approval had been given and expressions of interested parties had been solicited. No objection to the location, size or design of the bridge had been registered. In 1954 the Corps of Engineers certified the completed bridge as conforming to approved plans.
 
 
 6
 The piers of Bullard Bridge were not provided with fenders, dolphins or pilings to absorb impact. In 1968 and for several years prior thereto the principal river traffic consisted of lumber barges in transit to and from Rogge's Mill. In 1966 these barges were sixty-eight feet wide and passage under the bridge frequently entailed scraping and bumping against the piers.
 
 
 7
 Based on these facts, experts for the defendants expressed the opinion that the piers had a life expectancy independent of that of the remaining bridge structure because of the probability of major and minor damage from the barge traffic. Further they asserted that the piers were capable of replacement independent of the remaining structure.
 
 
 8
 In light of these facts and accepting the expert testimony the District Court found that the channel piers had a life expectancy of not more than thirty years "because of the hazards of severe damage due to the narrow passage between the two piers and the lack of pier protection." Since the piers had already enjoyed twelve years of life, the court applied a 40 per cent (12/30ths) depreciation factor and reduced recovery accordingly.
 
 
 9
 We hold this to be error.
 
 
 10
 The "new for old" rule seeks to avoid giving the injured person the windfall of providing him with a new replacement for that which was old and depreciated and would in normal course have to be replaced in any event.[2]
 
 
 11
 The rule has no application here.
 
 
 12
 In J. W. Paxson Co. v. Board of Chosen Freeholders, 201 F. 656, 663 (3d Cir. 1912), an iron draw span of a bridge was damaged when a barge struck it. The span was replaced. The court stated:
 
 
 13
 "The plaintiff was compelled, by the negligence of the defendant, to build a new structure, which, as a new structure, was possibly, though not certainly, more valuable than the old one. But the old structure sufficed for the purposes of the plaintiff, and the plaintiff was damaged by being compelled to procure a new structure in place of the old one, for the contract price of which it was obliged to pay. The sufferer by the negligence of the defendant cannot be compelled to perform the impossible task of re-creating the old span, without buying a new one, or make a nice computation of the difference in value between the old one and the new. The plaintiff did not need a new span. The old one was sufficient, and the county was damaged by being compelled to incur the cost of a new one."[3]
 
 
 14
 The same rule was more recently applied in United States v. Ebinger, 386 F.2d 557 (2d Cir. 1967), the court recognizing, however, that the rule may well be otherwise "where the damaged part was scheduled for early replacement, long before the expiration of the useful life of the whole."
 
 
 15
 Here the pier was an integral part of the bridge structure, not a separate part that through normal wear and tear would require independent replacement during the life of the structure. We cannot accept the assertion that the hazards of river traffic gave the piers an independent life expectancy of their own. Those hazards cannot in this case be imposed upon the owner of the bridge but must be assumed by the vessel creating the hazard. Government approval of the design and specifications of the structure constituted an authoritative determination that in the public interest river traffic could be limited to those vessels that could navigate the river without endangering the bridge. Oregon had every right to insist that river traffic avoid contact with its bridge and refrain from using the piers as though they were a ferry slip. While Oregon may not have insisted on this in the past, this does not mean that the state must continue to suffer such practices in the future and thus reduce the bridge's life expectancy.
 
 
 16
 Under these circumstances it is of no significance that the pier could be separately repaired or even replaced. (So could a single wall of a building.) The repair or replacement adds nothing of substance to the over-all value of the structure of which it is an integral part and the life expectancy of the entire structure has not been extended.
 
 
 17
 We conclude that Oregon is entitled to unreduced judgment in the sum of $191,938.70. Judgment must be modified accordingly.
 
 SAUSE BROS.' APPEAL
 
 18
 On appeal Sause Bros., owner of the tug, Go-Getter, makes the sole contention that the District Court erred in not limiting its liability to the value of the tug.
 
 
 19
 Under the Limitations Act, 46 U.S.C. Secs. 183-189, the owner of a vessel held at fault in a collision is entitled to limit his liability to the value of the vessel if the negligent acts or conditions were without his privity or knowledge. He is not personally responsible for the navigation and management of a seaworthy vessel after it is under way and outside his presence or that of his superintendent. Oliver J. Olson & Co. v. Luckenbach Steamship Co., 279 F.2d 662, 672-673 (9th Cir. 1960).
 
 
 20
 Here the District Court found that Sause Bros. itself was negligent "because it negligently permitted a single tug to be used in a delicate operation under adverse weather conditions and under control of a master who was not acquainted with the tug's controls, all of which [Vice-President] Curtis Sause knew."
 
 
 21
 Sause Bros. contends that it was not negligence to have Captain May take over, since the controls on the Go-Getter were identical to those on the captain's own tug, the Jean Nelson. This issue we need not reach.
 
 
 22
 The finding of negligence in failing to utilize two tugs was not clearly erroneous. Use of tugs fore and aft of the towed barge provides increased stability in making passage where clearance is narrow.
 
 
 23
 Sause asserts that use of a single tug was common practice on the Coquille River; that between 40 and 50 per cent of the barge traffic under Bullard Bridge was accomplished with a single tug. This does not persuade us that the finding was erroneous.[4] It seems only to suggest that 40 to 50 per cent of the vessels navigating the river were guilty of negligence and to explain the wrongful brushing and scraping to which the channel piers seem regularly to have been subjected.
 
 
 24
 Sause Bros. contends that use of a single tug was traditionally a decision to be made by the master of the tug and here was not the decision of Curtis Sause but of Captain May. It is, however, attributable to the owner to establish liability in personam if it was within his privity or knowledge as was here found by the District Court.[5]
 
 
 25
 We find no error in this appeal.
 
 
 26
 APPEAL OF OLSON TOWBOAT CO.
 
 
 27
 This appellant challenges the District Court's ruling that the action of Captain May in taking over the Sause Bros. tug, Go-Getter, was within the scope of his employment by Olson Towboat, and that the latter was liable for his acts of negligence under principles of respondeat superior.
 
 
 28
 The court found, in support of its holding that Captain May was acting within the scope of his employment: that he was performing work of the type that he customarily performed for his employer and at a time and place close to the task he had just performed; that had an Olson Towboat river tug been available at Bandon he would undoubtedly have been in charge of taking the barge upriver; that he believed he was authorized to perform such services; that it was in the interests of his employer that the barge reach its destination.
 
 
 29
 The court apparently had in mind Sec. 229 of the Restatement of the Law, Second, Agency, which enumerates indicia of scope of employment.[6] However, it is clear that to fall within the scope of a servant's employment the acts in question must be in furtherance of the master's business rather than the business of another. Williams v. United States, 248 F.2d 492, 500 (9th Cir. 1957); United States v. Romitti, 363 F.2d 662, 665 (9th Cir. 1966). The Restatement, supra, in discussing scope of employment refers back to its earlier discussion of the question of who is a servant. Comment c. of Sec. 228 reads:
 
 
 30
 *****
 
 
 31
 * * *
 
 
 32
 "As stated in Section 220, one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master. Hence, there is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no control or right to control by the master."
 
 Sec. 220(1) of the Restatement provides:
 
 33
 "A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."
 
 
 34
 The record here clearly establishes that the operation of towing the barge upriver was not the affair of Olson Towboat; that in that operation it had neither responsibility nor control.[7] In our judgment the District Court was clearly erroneous in finding that it was in the interest of Olson Towboat that the barge reach its destination.
 
 
 35
 The problem is rendered somewhat confusing by the close relationship between the Towboat Co. and the Olson Co., owner of the barge and of the lumbering operations at Rogge's Mill. There was an overlap of ownership and management. The record shows that the Towboat Co. expected its employees to co-operate and work courteously and harmoniously with the Olson Co. Captain May testified that he considered that in taking charge of the Go-Getter he was furthering the interests of the Olson Co. Further, the Olson Co. was the Towboat Co.'s principal customer accounting for over 90 per cent of its business.
 
 
 36
 However, it was the Towboat Co. and not the Olson Co. that was May's employer and the District Court expressly found that a case of alter ego was not presented and that the Towboat Co. was a distinct entity. The interest of Towboat in the barge ceased at Bandon when its job was completed. Taking the barge upriver became the responsibility of Sause Bros., with which the Towboat Co. had no connection whatsoever. The interest of Olson Co. in the barge did, of course, continue until the barge reached its destination. In taking charge Captain May could well have believed that he was furthering the interests of Olson Co. We fail to see, however, how he could reasonably have believed that he was furthering the interests of the Towboat Co., whose role in the operation had been fully completed.[8]
 
 
 37
 We conclude that it was error to hold Olson Towboat responsible for the negligence of Captain May. Our conclusion necessarily results in eliminating one of the interests between which damages were divided and aligns Captain May with Sause Bros.
 
 
 38
 Upon Oregon's appeal, judgment is modified to increase recovery to the sum of $191,938.70. Costs are awarded to Oregon.
 
 
 39
 Upon Sause Bros.' appeal, judgment is affirmed.
 
 
 40
 Upon Olson Towboat Co.'s appeal, judgment is reversed.
 
 
 41
 CHAMBERS, Circuit Judge (concurring and dissenting):
 
 
 42
 I agree with all of Judge Merrill's opinion except that portion excusing Olson Towboat from liability for Captain May's negligence. Olson Towboat's representative was present in Bandon during preparation for the tow upriver. This gave Olson Towboat the opportunity to control Captain May which the Restatement requires.
 
 
 
 [1]
 Also named was Oliver J. Olson Co., owner of the barge, J. Whitney. The District Court found no liability on the part of this defendant and no appeal has been taken from judgment dismissing the action against it
 
 
 [2]
 In Baltimore v. Rowland, 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869), dicta indicate that the rule should not apply in cases of negligence but should be confined to recovery based on contractual provisions common to insurance policies. "[T]he rule is that there shall not, as in insurance cases, be any deduction for the new materials furnished in the place of the old, because the claim of the injured party arises by reason of the wrongful act of the party by whom the damage was occasioned, and the measure of the indemnification is not limited by any contract, but is co-extensive with the amount of the damage." See also, The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876)
 In recent years the rule has, however, been recognized in appropriate cases as realistically defining the extent of damage actually suffered. See, e. g., Brooklyn Waterfront Term. Corp. v. International Terminal Op. Co., 211 F.Supp. 702 (S.D.N.Y.1962); Atkins v. Alabama Drydock & Shipbuilding Co., 195 F.Supp. 944 (S.D.Ala.1960). See also, McCormick on Damages, 470.
 
 
 [3]
 See also, T. H. Browning Steamship Co. v. F. H. Peavey & Co., 235 F.2d 5 (8th Cir. 1956); United States v. State Road Dept. of Florida, 189 F.2d 591 (5th Cir. 1951); Hewlett v. Barge Bertie, in Rem Evelyn, 418 F.2d 654 (4th Cir. 1969); Shepard S.S. Co. v. United States, 111 F.2d 110 (2d Cir. 1940); Pan-American Petroleum & Transport Co. v. United States, 27 F.2d 684 (2d Cir. 1928); West v. Martin, 51 Wash. 85, 97 P. 1102 (1908), and the discussion in Gillmore and Black, The Law of Admiralty, Sec. 7-18
 
 
 [4]
 See II Restatement of the Law of Torts, Sec. 295(A). Custom. "[I]n determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account but are not controlling where a reasonable man would not follow them."
 
 
 [5]
 "The principle of the Limitation Act is the same as that found in the Harter Act and the Carriage of Goods by Sea Act: because of the extraordinary hazards of seaborne commerce and because the owner can exercise only a nominal control over his 'servants' once the ship has broken ground for the voyage, the owner should be entitled to exoneration from liability, or at least to a limitation of liability, for whatever happens after the ship has passed beyond his effective control. Contrariwise, he should be held to liability for all loss resulting from his failure to exercise effective control when he had the chance." Gillmore and Black, The Law of Admiralty, Sec. 10-20
 
 
 [6]
 "Sec. 228. General Statement
 (1) Conduct of a servant is within the scope of employment if, but only if:
 (a) it is of the kind he is employed to perform;
 (b) it occurs substantially within the authorized time and space limits;
 (c) it is actuated, at least in part, by a purpose to serve the master,
 (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."
 
 
 [7]
 The record does not establish that Olson Towboat had any prior knowledge of the fact that Captain May was to take over the Go-Getter. Indeed, the reaction of a company official immediately after the accident was: "What the hell were you doing running the tug?"
 
 
 [8]
 Captain May might well have believed that he had been lent by Olson Towboat to Sause Bros. (which Towboat vigorously disputes), or that in light of his company's policy of co-operation with the Olson Co. he was authorized to lend himself on request when such loan would not interfere with his own duties. However, even were his assumptions correct, he would become the servant of Sause Bros
 Presence of the Towboat's crew (of the Jean Nelson) aboard the barge adds another confusing note. This apparently was established company practice-an instance of co-operation between the two related companies. However, the crew was there to provide service to Olson Co. (also perhaps as loaned servants), and any service to Sause Bros. was of the incidental sort that barge crews normally provide. Apparently it was on the barge that Captain May belonged instead of in charge of the Sause Bros. operation.