Opinion issued August 29, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01036-CV

————————————

**CENAC TOWING CO., INC. AND TEPPCO MARINE SERVICES, LLC,**
**Appellants**

**V.**

**JOHNNY DEFONTE, INDIVIDUALLY AND D/B/A PORT BOLIVAR**
**MARINE SERVICES, INC., Appellee**

---

On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Case No. 10CV0603

---

# MEMORANDUM OPINION

This case arises from an allision[1] of a tugboat and a stationary dock near the shore of the Intracoastal Waterway by Port Bolivar, Texas. Cenac Towing Co., Inc. and TEPPCO Marine Services, LLC, appeal the trial court's judgment in favor of appellee, Johnny Defonte, individually and d/b/a Port Bolivar Marine Services, Inc. In three issues, appellants contend that (1) appellee's violations of federal statutory law bar or reduce his recovery of damages; (2) the trial court abused its discretion in granting appellee's partial judgment notwithstanding the verdict based on its finding that appellants were not entitled to a depreciation of the damage award; and (3) there is a mathematical error in the final judgment that should be corrected. We modify the judgment and, as modified, affirm.

## Discussion

### A. Procedural History

Following an allision in July 2008, the dock owner sued the vessel owner for negligence on March 1, 2010. After filing its third amended answer, the vessel owner moved for summary judgment alleging that the dock owner had failed to (1) secure a permit for his structure and (2) maintain the structure as federal law required. Appellants further claimed that appellee's dock constituted a hazard to navigation and that appellee's violation of federal law absolved them of liability

---

[1] An "allision" is a collision between a moving vessel and a stationary object. THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 5-2 (West 4th ed. 2004).

2

for the damage to the dock. On October 3, 2011, the trial court denied appellants' motion for summary judgment and on February 28, 2012, conducted a bench trial with the Honorable Rusty Hight presiding. At the conclusion of trial, the court found in favor of appellee on his negligence claim and awarded him $110,000.00 in damages but depreciated the award to $80,000.00. On March 16, 2012, appellee filed a motion for partial judgment notwithstanding the verdict asking that the court award the full amount of damages. On October 11, 2012, having found that appellants were not entitled to a depreciation allowance, The Honorable Susan Criss granted appellee's motion.[2]

## B. Factual Background

At trial, the parties presented the following witnesses:

### 1. Johnny Defonte

In 2003, appellee purchased the dock and surrounding property in question from John Seed, the prior owner, for $250,000. Appellee cleaned up the property but never did anything to the structure. Appellee testified that neither the United States Army Corps of Engineers (USACE) nor any other governmental agency had ever contacted him regarding permitting for the structure, or informed him that he lacked a necessary permit.

---

[2] Judge Hight passed away before the hearing on appellee's motion.

Appellee, his son, and four other people witnessed the allision of the tugboat, C.N.V. CULLEN CENAC, with appellee's dock, and appellee testified that the vessel broke the retaining wall of his structure. Afterwards, he contacted the United States Coast Guard (USCG) regarding the allision. Appellee testified that the USCG did not inform him that his dock was illegal or that he lacked a permit for the structure.

### 2. Reginald Sims

Sims, Cenac's captain, was operating the tugboat and pushing two barges (each 97' long by 54' wide) when the allision occurred. He testified that he had tied up his boat at appellee's dock once before and there is nothing unusual about appellee's dock. On July 26, 2008, Sims steered his tugboat to the bank of the waterway in Port Bolivar while he waited for a space at Marathon Dock in Texas City. As he prepared to leave appellee's dock, the tide was going out and his lead barge became stuck on the ground. In the process of twisting his tugboat to push the barge loose, he struck appellee's dock.

Sims testified that the waterway is at least three-hundred feet wide from bank to bank, and that tugboats pushing barges "doubled up"—that is, two barges side-by-side—routinely pass by appellee's dock without incident. The only hazard of which Sims was aware was a half-sunken barge in the middle of the channel. Sims testified that appellee's dock was not the cause of the accident.

4

### 3. Mark Underhill

Appellee hired Underhill, a marine surveyor, as part of a joint survey before litigation to determine the extent of damage to appellee's dock caused by the allision. Underhill and Bill Hatfield, appellants' marine surveyor, conducted the joint survey.

Underhill testified that he had reviewed nautical charts of this waterway dating from 1966 to 2007 from the National Oceanic and Atmospheric Association's (NOAA) Office of Coast Survey. He testified that the navigable portion of the waterway is "the portion that is dug and maintained for the intracoastal canal and traffic." He further testified that NOAA places buoys along the channel to mark the edges of the navigable channel.

According to Underhill, no portion of appellee's dock interferes with the navigable portion of the waterway. Underhill testified that the barges being pushed by the C.N.V. CENAC were fifty-four feet wide, and that vessels pushing barges of that width are able to pass each other in the intracoastal waterway without even coming close to appellee's dock. Underhill testified that appellee's dock "is in no way a menace to the navigation of the Intracoastal Waterway." Based on the 2007 chart showing the defined limits of the intracoastal waterway running down the middle of the canal, Underhill testified that the chart showed that appellee's dock was not an obstruction to navigation.

When asked whether commercial traffic typically tried to stay within the middle portion of the waterway unless passing a vessel, Underhill replied "yes, you want to stay into the channel as much as possible" and stated that a tugboat would not travel along the bank and would only push over to the bank to retie its tow or to tighten up the steamboat ratchets. He testified that "you're not normally going to hug the bank. You're just asking for trouble. There's no guarantee of water. You don't know where the mud flats are or not."

Underhill stated that appellee had not violated any federal permits. He stated that the permits that appellants introduced at trial pertained to a request to permit dredging to maintain a now-defunct marina.

Underhill also testified regarding two bids to repair appellee's dock. There was a $29,000.00 bid, which he testified was "a ridiculous amount" and "I do not believe you can even get the materials for that." He testified that the $204,000.00 bid submitted by Kiva Construction Company was for a new dock and, thus, exceeded the scope of damage to appellee's dock. Based on his survey, Underhill determined that the allision damaged approximately twenty-five percent of the dock. Using Kiva's bid, Underhill calculated the total cost of repairing appellee's dock, including materials, labor and equipment, at $98,239.36.

Underhill further testified that but for the allision, appellee's dock could have lasted another fifty to one-hundred years and that appellee's structure did

what it was supposed to do, i.e., retain the bank and keep it from sloughing off into the channel. He testified that depreciation should not be applied to the damages in this case because the dock would have continued to do its job but for the damage caused by the allision.

### 4. William Hatfield

William Hatfield, Cenac's surveyor who participated in the joint survey of appellee's dock, testified that twenty-four feet of the dock's retaining wall was damaged as a result of the allision. After he conducted the survey, he discussed his findings with his father, Earl Hatfield, owner of Earl Hatfield Marine Surveyors, LLC.

### 5. Earl Hatfield

Earl Hatfield testified that appellee's dock was approximately twenty-five years old and that the typical service life of such a structure in South Texas is thirty years due to the environment. He testified that, based on its condition, he would allocate an eighty-percent depreciation to appellee's structure. Based on his review of the findings from the joint survey, Earl Hatfield estimated a cost of $25,000 to repair the damage to appellee's dock. He testified that the USACE permits introduced by appellants only reflected that the west end of appellee's dock was properly permitted but that the north and east ends were not reflected in

7

the permits. According to Hatfield, the navigable portion of the waterway is "bank to bank."

### 6. Terry Chandler

Chandler is a maritime contractor and a damage estimator with Kiva Construction Company. He testified that Kiva had previously parked a barge at appellee's dock as well as at an adjacent dock and that appellee's dock does not interfere with navigation of the waterway. In his opinion, the cost of repairing appellee's dock to its pre-allision condition would be $100,000.00 to 110,000.00. Chandler further testified that but for the damage caused by the allision, appellee's dock was still functional and would not have needed to be replaced in the near future.

He testified that, although Kiva requires an owner to apply and secure a permit for installation of a new structure, no permit is required to repair an existing structure. He testified that if the steel inside of appellee's concrete structure did not become exposed, the structure could last fifty years or more. When the trial court asked whether all of the concrete would have to be removed in order to repair the damaged portion, Chandler replied that "to do three panels wide you might have to do five to get three back in line."

### 7. Jeff Webster

Appellants presented Webster as an expert on the issues of federal regulations and permitting. He testified that navigable waters of the United States are "any waters in which commercial traffic can trade in" and that the "[m]aintained channel is one that is constantly dredged because it tends to silting."

Appellants introduced four letters (dated 1985, 1987, 1989, and 1999) from the USACE to John Seed, the dock's prior owner, and the attached proposed plans from Seed. In these letters, the Army Corp of Engineers authorized Seed by permit to perform maintenance dredging in a slip off the Gulf Intracoastal Waterway. He testified that the photographs taken of appellee's structure after the 2008 allision do not depict a structure identified in Seed's proposed plans. Webster testified that according to the original plan Seed submitted in 1985, the piles were supposed to be positioned adjacent to the waterway, i.e., on the shore and not in the water. He stated that he had not seen any permit authorizing the structure as depicted in the photographs taken after the allision. Webster also testified that, in his opinion, appellee's structure interfered with the navigable waters and was "clearly a hazard." He also stated that such a structure, if maintained on land, can last twenty to twenty-five years but that exposure to water could shorten its life.

According to Webster, the pylons in front of appellee's dock were approximately eight to ten feet away from the shoreline. He testified that he was

9

unaware of any vessels traveling the waterway that are wider than 290 feet.

C. **Standard of Review**

When, as here, a party appealing from a non-jury trial does not request findings of fact and conclusion of law, the appellate court presumes the trial court found all fact questions in support of its judgment, and the reviewing court must affirm the judgment on any legal theory finding support in the pleadings and evidence. *See Point Lookout W., Inc. v. Wharton*, 742 S.W.2d 277, 278 (Tex. 1987); *George v. Jepperson*, 238 S.W.3d 463, 468–69 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In a bench trial, it is for the court, as trier of fact, to judge the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony. *Shaw v. Cnty. of Dallas,* 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied).

D. Analysis

1. *Alleged Violations of Federal Statutory Law*

In their first issue, appellants contend that appellee's structure constitutes an obstruction to the navigable waters in violation of the Rivers and Harbors Act, 33 U.S.C. §§ 401–407 (2002), and the U.S. Coast Guard's United States Aids to Navigation System, 33 C.F.R. § 64.06, 66.01-5 (2013). Appellants argue that appellee's violation of federal laws bars or reduces his recovery for the damage to

10

his dock.  Appellee denies that his dock violates federal law or obstructs the navigable portion of the waterway.

Section 403 of the Rivers and Harbors Act provides, in relevant part:

**Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in**

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army . . . .

33 U.S.C. § 403 (2002).

Appellants' argument is two-fold.  First, they maintain that appellee's dock was an unlawful obstruction to navigable waters, and thus, under the Act, appellee needed authorization for his dock.  Second, they contend that appellee's failure to secure authorization for his structure violated the Rivers and Harbors Act.

*A. Obstruction to Navigation*

In support of their first argument, appellants contend that appellee had allowed his structure to become exposed in the water thereby interfering with the permissible bank-to-bank navigation of the intracoastal waterway.  There was conflicting evidence presented at trial regarding the definition of "navigable waters."  Appellants' expert, Webster, testified that navigable waters of the United

11

States are "any waters in which commercial traffic can trade in." Earl Hatfield, appellants' marine surveyor, testified that the navigable portion of the waterway is bank to bank. Underhill, appellee's surveyor, testified that the navigable portion of the waterway is "the portion that is dug and maintained for the intracoastal canal and traffic," and that NOAA places buoys along the channel to mark the edges of the navigable channel.[3] There was also conflicting testimony regarding whether

---

[3] Section 2.36(a) of Chapter 33 of the Code of Federal Regulations provides:

**§ 2.36. Navigable waters of the United States, navigable waters, and territorial waters.**

(a) Except as provided in paragraph (b) of this section, navigable waters of the United States, navigable waters, and territorial waters mean, except where Congress has designated them not to be navigable waters of the United States:

(1) Territorial seas of the United States;

(2) Internal waters of the United States that are subject to tidal influence; and

(3) Internal waters of the United States not subject to tidal influence that:

(i) Are or have been used, or are or have been susceptible for use, by themselves or in connection with other waters, as highways for substantial interstate or foreign commerce, notwithstanding natural or man-made obstructions that require portage, or

(ii) A governmental or non-governmental body, having expertise in waterway improvement, determines to be capable of improvement at a reasonable cost (a favorable balance between cost and need) to provide, by themselves or in

12

appellee's dock interfered with navigation of the waterway. Although Webster testified that appellee's structure interfered with the navigable waters and as "clearly a hazard," Underhill testified that, based on his review of NOAA charts, appellee's dock "is in no way a menace to the navigation of the Intracoastal Waterway." Chandler, Kiva's maritime contractor, also testified that appellee's dock does not interfere with navigation of the waterway. Sims, the tugboat captain, testified that boats pushing doubled-up barges routinely pass by appellee's dock without incident, and that appellee's dock was not the cause of the accident. In light of this record, we find that the trial court had sufficient evidence before it to support its finding that appellee's dock did not interfere with navigation.

## B. Necessity of Permit

Appellants also argue that appellee violated federal law because he operated his dock without the requisite permit. In support of their argument, appellants rely on the four permits the USACE issued to Seed[4] and argue that appellee never sought to transfer or re-file the permits and, in failing to do so, violated the United

---

connection with other waters, as highways for substantial interstate or foreign commerce.

33 C.F.R. §2.36 (2013)

[4] The USACE issued permit no. 15926/12 in 1985, no. 15926/32 in 1987, no. 18931 in 1989, and no. D-10753 in 1999.

States Aids to Navigation System. *See* 33 C.F.R. § 66.01-30 (2013).[5] However, a review of these permits reveals that they authorized Seed to perform, or to continue performing, maintenance dredging in a slip off the intracoastal waterway. Underhill also testified that the permits pertained to a request to permit dredging to maintain a now-defunct marina.

Appellants also argue that appellee's failure to obtain a permit for his structure deprived the USCG of the opportunity to mark his structure in accordance with 33 C.F.R. § 66.01-5. Appellant's argument is without merit. Section 66.01-5 sets out the application procedure for building a *new* structure. Further, a structure is defined as a "fixed or floating obstruction, intentionally placed in the water, which may interfere with or restrict marine navigation." *See id.* § 64.06. As discussed above, the evidence supported the trial court's conclusion that appellee's dock did not interfere with navigation.

---

[5]     Section 66.01-30 provides:

(a) Before any private aid to navigation consisting of a fixed structure is placed in the navigable waters of the United States, authorization to erect such structure shall first be obtained from the District Engineer, U.S. Army Corps of Engineers in whose district the aid will be located.

(b) The application to establish any private aid to navigation consisting of a fixed structure shall show evidence of the required permit having been issued by the Corps of Engineers.

33 C.F.R. § 66.01-30 (2013).

As the trier of fact, it was up to the trial court to judge the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony. *LaCroix v. Simpson*, 148 S.W.3d 731, 734 (Tex. App.—Dallas 2004, no pet.). As the reviewing court, we presume that the trial court found all fact questions in support of its judgment, and must affirm the judgment on any legal theory finding support in the pleadings and evidence. *See Point Lookout W., Inc.*, 742 S.W.2d at 278; *George*, 238 S.W.3d at 468–69. Here, the trial court had the opportunity to hear the witnesses and to resolve conflicts and inconsistencies in the testimony. *See Montgomery Ind. Sch. Dist. v. Davis,* 34 S.W.3d 559, 567 (Tex. 2000). Based on our review of the record, we conclude that there was sufficient evidence to support the trial court's conclusion that appellee did not violate the Rivers and Harbors Act or the USCG's United States Aids to Navigation System. *See* 33 U.S.C. §§ 401-407 (2002); 33 C.F.R. § 64.06, 66.01-5 (2013).[6] We overrule appellants' first issue.

---

[6]    Because the trial court found that appellee had not violated federal statutory law, the *Pennsylvania Rule* cited by appellants—under which a ship that violates a statutory rule intended to prevent collisions is presumed to be the contributing, if not the sole, cause of the incident—is inapplicable in this case. *See The Pennsylvania*, 19 Wall 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873), *overruled on other grounds by United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *see Pennzoil Producing Co. v. Offshore Explor., Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991).

## 2. *Depreciation of Damage Award*

In their second issue, appellants contend that the trial court erred when it granted appellee's motion for partial judgment notwithstanding the verdict based upon its finding that appellants had failed to present evidence entitling them to a depreciation allowance. Appellee argues that the trial court correctly rendered judgment without depreciating the damage award.

At the conclusion of trial, Judge Hight awarded appellee $110,000.00 in damages and depreciated the award to $80,000.00. Appellee filed a motion for partial judgment notwithstanding the verdict arguing that appellants had presented no evidence entitling them to a depreciation of the award. Judge Criss granted appellee's motion.

In maritime allision cases, the general rule regarding depreciation is "where the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation." *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir.1994); *see also Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel*, 304 Fed. App'x. 278, 2008 WL 5341377 (5th Cir. 2008) (per curiam). In *Cargill*, a wharf owner brought suit to recover for damages to its wharf as a result of the negligent docking and landing of a ship. *See id.* at 279. Applying the rule above, the Fifth Circuit reasoned that "[i]f the repaired wharf walkway is 'integral' to Cargill's wharf—because the repaired section will not be

16

replaced independently and/or retained when the rest of the wharf is rebuilt—and the repairs do not extend the useful life of the entire wharf, repair costs will not be depreciated." *Id.* at 280-81; *see Brunet*, 15 F.3d at 505-06 (holding that repair costs not subject to depreciation because damaged pipeline crossing was part of larger system and would require replacement when larger pipeline system was replaced). Thus, the proper inquiry here is whether the damaged portion of appellee's structure is integral to the entire structure; that is, whether there is evidence that the damaged portion of the dock will be replaced again when the structure as a whole reaches the end of its useful life—if so, appellee will not receive the benefit of any useful life extension, and no depreciation should be taken. *See Brunet*, 15 F.3d at 505-06; *Cargill*, 304 Fed. App'x. at 281.

Appellants contend that there is no evidence establishing that the damaged portion of appellee's dock was an integral part of the entire structure. They argue that the surveyors and Chandler testified that the individual panels of the concrete retaining wall could be replaced without having to replace the entire wall, and that Chandler testified that replacing the damaged portion of the wall will add to the useful life of the structure. Thus, appellants reason, the portion to be replaced is not integral to the whole structure.

First, we note that whether the damaged portion of appellee's dock *could* be replaced without having to replace the entire structure is not the proper inquiry.

17

*See Oregon v. Tug Go-Getter,* 468 F.2d 1270, 1273–74 (9th Cir.1972) ("Under these circumstances it is of no significance that the pier could be separately repaired or even replaced. (So could a single wall of a building.)").  Rather, the question is whether the damaged portion of appellee's dock will be replaced again when the dock as a whole reaches the end of its useful life.  While there was testimony from several witnesses regarding the length of the structure's useful life,[7] we find nothing in the record to support appellants' assertion that the damaged portion of appellee's dock would not be replaced when the entire structure reaches the end of its useful life.

Appellants also assert that Chandler testified that replacing the damaged portion of the wall will add to the useful life of the structure.  Appellants rely on the following portion of Chandler's testimony:

> Q;   I'm asking you as an estimator for Kiva, could you give the judge a fair and reasonable estimate for repair of that portion of the dock at issue that was damaged by the CULLEN CENAC?

---

[7]   Underhill testified that, but for the allision, appellee's dock could have lasted another fifty to one hundred years.  Chandler testified that if the steel inside of appellee's concrete structure did not become exposed, the structure could last fifty years or more.  Webster stated that such a structure, if maintained on land, can last 20-25 years.  According to Earl Hatfield, the typical service life of such a structure in South Texas is thirty years.

A:   You're saying they've got stuff that's not the entire dock, just the area that they are talking about?

Q:   Yes, sir, I am[.]

A:   I think it would be around a hundred, hundred and ten thousand range.

Q:   Is that to repair the damage and get it back into the condition it was prior to the collision at issue?

A:   That's correct.

Q:   Now, with regard to the dock based on your experience in the industry, we know there's damage as a result of the collision. But for that damage was the dock still functioning and operating?

A:   Yes.

Q:   As an estimator, but for the damage did you see any reason why the dock would have to be replaced in the near future?

A:    No.

Contrary to appellant's contention, Chandler did not testify that repairing the damaged portion of the dock will add to the useful life of the entire structure; rather, his testimony spoke only to the length of the useful life of the dock (i.e., that it was not near the end of its useful life).  Further, this testimony is consistent with Chandler's earlier testimony that the structure could last fifty years or more if the steel inside of it did not become exposed.

Here, there were no findings of fact or conclusion of law requested and, thus, we presume that the trial court found all fact questions in support of its

19

judgment. *See Point Lookout W., Inc.*, 742 S.W.2d at 278. Appellee was entitled to the cost of repairing his dock to its pre-allision condition. *See Freeport Sulphur Co. v. S.S. Hermosa,* 526 F.2d 300, 304 (5th Cir.1976) (explaining that purpose of damages for maritime tort is to place injured party as nearly as possible in condition it would have occupied if accident had not occurred). Based on the record before us, we cannot say that the trial court's finding that appellants failed to present any evidence entitling them to a depreciation of the damages award was error. As such, the trial court properly granted appellee's motion for partial judgment notwithstanding the verdict awarding appellee the full amount of damages. Accordingly, we overrule appellants' second issue.

### 3. Error in Judgment

In their third issue, appellants complain that the final judgment signed by the trial court on October 11, 2012, is incorrect. Specifically, they contend that the judgment should award appellee a total award of $140,419.84 instead of $140,938.76. Appellee concedes that there are mathematical errors in the judgment.

The October 11, 2012 final judgment awards appellee $110,000.00 in damages and "pre-judgment interest on this amount from the date of notice of the damage . . . up until the time of entry of this Judgment in the amount of THIRTY THOUSAND FOUR HUNDRED NINETEEN DOLLARS AND 84/100 ($30,938.76), for a

20

total recovery of ONE HUNDRED THIRTY THOUSAND FOUR HUNDRED NINETEEN DOLLARS AND 84/100 ($130,938.76)." We agree that the numerical value of the prejudgment interest on the damage award is incorrect, and that the total award was miscalculated. Because we have the necessary information before us, we may reform the judgment. *See* TEX. R. APP. P. 43.2(b); *Mullins v. Mullins*, 202 S.W.3d 869, 878 (Tex. App.—Dallas 2006, pet. denied). The numerical value of the prejudgment interest should be corrected to read $30,419.84, and the total damage award should be corrected to read "ONE HUNDRED FORTY THOUSAND FOUR HUNDRED NINETEEN DOLLARS AND 84/100 ($140,419.84)." Accordingly, we sustain appellants' third issue.

## Conclusion

We affirm the trial court's judgment in favor of appellee on his negligence claim. However, we modify the judgment to reflect the numerical value of the prejudgment interest as $30,419.84, and to reflect the total damage award as "ONE HUNDRED FORTY THOUSAND FOUR HUNDRED NINETEEN DOLLARS AND 84/100 ($140,419.84)."

We affirm the trial court's judgment, as modified.

21

Jim Sharp
Justice

Panel consists of Justices Jennings, Higley, and Sharp.