EDWARDS, JUDGE PRO TEMPORE, J.
The issue presented for our review in this matter relates to the proper method of calculating depreciation for purposes of awarding compensatory damages in a case involving an allision[1] of a towboat and barges with a fender of the Sunshine Bridge. For reasons that follow, we affirm.
The parties stipulated to the facts, liability and cost of repairs before trial. According to the joint stipulation, on April 11, 2008, the M/V RICKY J. LEBOUEF, owned by Taira Lynn Marine Limited No. 7, L.L.C. (Taira Lynn), and operated by D & S Marine Services, L.L.C. (D & S), allided with the Sunshine Bridge Pier No. 4 fender system. At the time of the allision, the M/V RICKY J. LEBOUEF was towing two barges. River currents caused the tow to allide with the downstream fender of the Sunshine Bridge, causing extensive damage and requiring an expenditure of $1,569,544.75 for repairs. Both Taira Lynn and D & S stipulated to liability for the allision, but reserved their right to litigate all aspects of damage claims.
The State of Louisiana, through its Department of Transportation and Development (DOTD), filed suit against Taira Lynn and D & S to recover the cost of repairs to the bridge. As a result of the joint stipulation, the only remaining issues before the trial court at the trial on the merits concerned:
1.) whether the claims of the DOTD are subject to a reduction for depreciation, and if so, the appropriate rate of depreciation;
2.) whether the value engineering proposal to replace the timber Pier No. 4 fender system with a timber and steel fender system was properly *862 accepted, and if so whether Taira Lynn is entitled to any credit for the savings realized pursuant to the value engineering proposal;
3.) Whether Taira Lynn is entitled to a credit for the bid bond forfeited by Johnson Bros. Construction when it withdrew its successful bid for State Project No. H. 002926.6.
After a trial on the merits, the trial court rendered judgment decreeing that the DOTD was entitled to a recovery of $720,696.58 plus judicial interest pursuant to La. R.S. 13:4203[2] . The trial court issued written reasons for judgment in which it detailed the reasoning for the reduced award. Specifically, the court made a determination that a 50% depreciation rate was appropriate, and that defendants were entitled to a bid bond credit in the amount of $64,075.80.[3] Both defendants appealed that judgment, arguing that the trial court erred in its determination that depreciation should be "capped" at 50%.
DISCUSSION
The sole issue presented to this Court relates to the determination of depreciation applicable to the award of damages. As previously stated, the trial court used a 50% depreciation rate in its award of damages.
Defendants/appellants, Taira Lynn and D & S, argue that the trial court erred as a matter of law by applying a portion of the Truman-Hobbs Bridge Act of 1940 (Truman-Hobbs) embodied in 33 C.F.R. § 277.8(g)(2), which suggests a 50% depreciation on the expired service life of the structure in establishing depreciation. Appellants assert that a straight-line depreciation analysis using a ratio of the property's actual life divided by the property's expected useful life at acquisition is appropriate. Using that analysis, appellants argue that, in this instance, the actual life is 45 years and the expected useful life at acquisition is 50 years, resulting in a depreciation of 90%. Appellants conclude the trial court's ruling on this issue is an error of law which invokes a de novo review in this Court.
DOTD counters appellants' arguments by pointing out that general maritime law does not impose a fixed rule for the calculation of depreciation. DOTD asserts that other factors, such as the type of materials originally used, the care and use, and the state of repair maintained are all essential elements to be considered in the determination of the applicable rate of depreciation. DOTD also disputes appellants' conclusion that the applicable standard of review is de novo, and asserts that the award of damages should be upheld because it is not clearly erroneous.
Testimony at trial established that the Sunshine Bridge is a steel continuous truss bridge built in 1963. The top is the superstructure, or the actual truss. From the truss down is soft structure, incorporating wood timbers. There is a fender system to protect the bridge in the event of an extreme impact. Pier 4, part of the fender system, was damaged in this incident. Repair was an "in kind" repair, meaning that *863 the same configuration and clearances as originally constructed were used.[4]
The trial court heard testimony from two experts in bridge engineering on the topic of depreciation analysis. DOTD presented evidence from Zolan Prucz, Ph.D, P.E., whose firm was hired to repair the bridge. Dr. Prucz recommended a 50% depreciation based on the Truman-Hobbs guidelines as evaluated, and on all other conditions of this specific bridge as it relates to similar structures spanning the Mississippi River nearby, namely the Huey P. Long Bridge and the Crescent City Connection.
Dr. Prucz explained that the factors used to determine the service life of a fender system include the type of structure, the material used, the function and conditions to which it is exposed, performance expectations, age, and maintenance and repair history. Dr. Prucz testified that the Truman-Hobbs Bridge Act provides guidance in this determination in that it contains service life estimates agreed upon in the industry.
Dr. Prucz clarified the difference between the expected service life of a structure and the actual service life. He stated that values presented relating to expected service life refer to the expectation of a structure when new, i.e., the probable life. These values do not take into account the condition of the structure at any given time. They are based on statistics of service life of similar structures in the past. In short, the concept of expected useful life applies to a future projected useful life of a new structure. Actual service life, in comparison, relates more to structures that have been in existence and have a history of performance, and/or a quantifiable nature of deterioration over the years.
In evaluating and rendering a professional opinion on the useful life of a structure such as Pier 4, the actual useful life, as opposed to the expected useful life, is a more accurate and a better measure of the useful life of the structure for purposes of depreciation in Dr. Prucz's professional opinion. Dr. Prucz estimated a 50 year expected useful life for the Sunshine Bridge. He stated that the fender was in good condition when it was removed, with some newer timbers showing ongoing maintenance.
Taira Lynn and D & S offered the testimony of Donald Barnes, P.E. who opined that the depreciation rate should be increased to 75% based on inadequate maintenance and condition of the pier. Although Mr. Barnes did find some newer timbers, he disagreed with Dr. Prucz's assessment on the condition and maintenance, finding it lacking.
Mr. Barnes focused on the conditions of the fender of the Sunshine Bridge and found that timbers were deteriorating, indicating the ongoing maintenance program was inadequate. Mr. Barnes found deteriorating timbers in the structural truss meant to protect the pier, causing it to weaken. However, during his testimony there was some confusion as to whether the photograph used to support this assertion was actually from Pier 4 or Pier 5.
Mr. Barnes cited a study from the American Wood Preservers Institute (AWPI) on the life expectancy of wooden timbers. That study indicates that the expected service life of timbers is 75 years in northern climates, but only 40 years in southern climates. Additionally the AWPI study shows that wood timbers last 5 or 10 years less in a marine environment. Ultimately, Mr. Barnes estimated that the timbers *864 in Pier 4 were 15 years past their life expectancy.
Both experts discussed the Truman-Hobbs Bridge Act. In his testimony, Dr. Prucz explained that the act was passed in the 1940's, and covers policy rules and procedures for apportioning reconstruction costs when replacing highway and railroad bridges that are deemed to be a hazard to navigation. Dr. Prucz testified that Truman-Hobbs has application in the matter in so far as it provides uniformity in establishing the service life of a bridge. Dr. Prucz explained that Truman-Hobbs relied on data produced and accepted by different agencies, and establishes valuable guidelines that provide uniformity. This is particularly important in the evaluation of state structures like the Sunshine Bridge because they can be compared to similar structures around the country. Dr. Prucz testified that, although the guidelines in Truman-Hobbs offer valuable guidance, these guidelines are not simply mathematically applied. Ultimately, Dr. Prucz recommended a 50% depreciation rate based on all valuation factors.
ANALYSIS
On appeal, appellants assert the trial court erred in failing to apply "new for old" principles and straight-line depreciation under general maritime law and in "capping" depreciation at 50% pursuant to the Truman-Hobbs Bridge Act. The "new for old" rule seeks to avoid giving the injured person the windfall of providing him with a new replacement for that which was old and depreciated and would in normal course have to be replaced in any event.[5]
Appellants reason that DOTD should not be allowed a betterment of its position. Rather, DOTD should only be allowed to recover the amount of compensatory damages that would return it to the position it was at the time of the allision. In support of that assertion, appellants argue that the fender, which was 45 years old at the time of the accident and had a 50 year expected life span, should be depreciated by 90% using the "new for old" and straight-line depreciation analysis of general maritime law.
Appellee counters that there is no fixed rule for the calculation of depreciation in general maritime law, and points out that neither expert testified that a straight-line calculation should be applied. Appellee further notes that even appellants' own expert testified that a 75% rate of depreciation was appropriate based on the condition of the pier at the time of the incident.
In the matter before us, it is only one fender that has been repaired, not the entire bridge. The concept that a pier of a bridge has an independent life expectancy of its own due to the hazards of river traffic has been rejected by the federal courts.[6] A pier of a bridge has been compared to a wall of a building, in that the repair or replacement of the pier adds nothing of substance to the over-all value of the structure of which it is an integral part.[7]
In Oregon v. Tug Go-Getter[8] , the defendant's barge collided with and caused severe damage to the south pier of the plaintiff's bridge. The Ninth Circuit held that the cost of repairs should not be reduced by depreciation on the old pier. The court reasoned that the repairs did not add to *865 the life expectancy because the pier was an integral part of the bridge structure, and regardless of the pier's condition it would have to be replaced when the bridge required replacement.
In City of New Orleans for Use & Benefit of Sewerage & Water Bd. of New Orleans v. Am. Commercial Lines, Inc.,[9] the court found the cost to repair a nine-year-old fender with no evidence of deterioration at the time of the accident was not subject to the "new for old" rule.
In Brunet v. United Gas Pipeline Co.[10] , a pipeline crossing that was a small part of a much larger pipeline system was damaged. The crossing normally would not have been replaced until the entire pipeline was replaced. Under these facts the court found the defendant was not entitled to a deduction for depreciation.
When applying the facts of this case to the applicable law, we find the "new for old" rule has no application.[11] Pier 4 is an integral part of the Sunshine Bridge, which if undamaged, would not have to be replaced until the entire bridge was scheduled for replacement. Accordingly, we find this argument to be without merit.
Appellants also argue the trial court should have applied the straight-line depreciation to this case. We disagree. While straight-line depreciation is used in maritime law, it is not the exclusive method for calculating depreciation. Straight-line depreciation is generally used when the expected useful life of the property after repairs is the same as it was at the time of its acquisition.[12] In other cases in which the straight-line depreciation formula has been applied, the court either assumed or explicitly found that the repaired or replaced property had a useful life identical with the old property when it was purchased by the plaintiff.[13]
In general maritime law, straight-line depreciation is a "handy tool" to establish an amount of damages appropriate to return an injured party to its economic position before the accident.[14] However, the federal courts have recognized that straight-line depreciation does not apply in all cases. "[W]here the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation."[15] Whether depreciation should be applied, depends on whether the repairs extended the useful life of the property and, if so, what portion of the repair costs is attributable to the useful life extension.[16] "While a linear, or straight line, depreciation method is most commonly used for property with a fixed life span, this method is not to be applied where evidence establishes that the original property had been deteriorating at a nonlinear rate."[17]
There is testimony from both experts relating to the expected life span and the *866 rate of deterioration. While the experts disagreed on both of those issues, neither testified that a straight-line depreciation method is appropriate here. Given the testimony and documentary evidence contained in the record before us, we do not find a straight-line depreciation calculation is appropriate in this case.
Appellants also argue that the trial court's reliance on 33 C.F.R. § 277.8(g)(2) is legal error. We disagree. 33 C.F.R. § 277.8 is part of Chapter II, Corps of Engineers, Department of the Army, contained in Title 33 of the Code of Federal Regulations which governs navigation and navigable waters. 33 C.F.R. § 277.8 sets forth "the procedures for apportionment of costs of bridge alterations, as established by the U.S. Coast Guard (reference § 277.3(c) ) and adapted for use in Corps planning and construction programs."[18] Clearly, this regulation was not intended to determine compensatory damages in a civil lawsuit and is not controlling. In that, we agree with appellants. However, this regulation can be useful as guidance in the difficult task of calculating the expected life span and rate of depreciation of an integral part of a bridge, especially considering the extensive amount of data collected by Congress before its enactment.
33 C.F.R. § 277.8(g) provides in pertinent part as follows:
(2) For timber structures which have been in existence for more than 50 percent of their estimated service life, the expired service life is held usually at 50 percent providing the structure has been adequately maintained and is in a good state of repair.
We recognize that 33 C.F.R. § 277.8(g)(2) refers specifically to railroad bridges. However, we do not find that the trial court erred as a matter of law in accepting an expert opinion that the factors in 33 C.F.R. § 277.8(g) give guidance in determining the expected life span of a bridge for the purpose of determining the rate of depreciation, especially in light of parts (3) and (4) of 33 C.F.R. § 277.8(g)[19] . This position is further supported by the other factors considered by both experts and ultimately accepted by the trial court. It is clear from Dr. Prucz's testimony that these regulations were used only as guidelines in his estimate of the rate of depreciation, not as mandates. Therefore, we do not find a de novo review is required.
We are cognizant of appellant's concern that the trial court indicated in the reasons for judgment that Dr. Prucz opined that 33 C.F.R. § 277.8(g)(2) is "applicable." While the trial court used the word "applicable", neither the reasons for judgment nor the judgment itself shows that the trial court considered that section of the law to be binding or controlling. A reading of the reasons for judgment and the expert opinions on which it relies shows that the trial court merely considered 33 C.F.R. § 277.8(g)(2) to be illustrative and helpful in establishing a depreciation rate.
*867 Furthermore, the reasons for judgment are not the judgment itself. Appeals are taken from the judgment, not the written reasons for judgment.[20] Reasons for judgment set forth the basis for the court's holding and are not binding.[21] Because we find no error of law in the trial court's ruling, a de novo review of the record in inappropriate.
The district court's determination on the amount of damages may not be overturned unless clearly erroneous.[22] A reading of the reasons for judgment shows the trial court weighed the testimony of the two experts and found Dr. Prucz's to be more convincing. Thus, the trial court accepted Dr. Prucz's opinion that depreciation should be 50%. Although Dr. Prucz explained the Truman-Hobbs Bridge Act and its relevance, it is clear from the testimony that other factors, specific to the Sunshine Bridge, entered into Dr. Prucz's opinion. Specifically, Dr. Prucz considered the age and condition of the structure, the type of materials used, the function, the conditions to which the bridge is exposed, including the extent of use and the condition of the pier when it was removed. Dr. Prucz compared these factors to other similar bridges in the area that span the Mississippi River.
Mr. Barnes testified that Truman-Hobbs relates to the allocation of funds to rebuild a bridge and stated that he does not use that act in his determination of depreciation in the context of bridge repairs. He further testified that, even assuming the act applies, the 50% depreciation rule is not applicable because of the inadequate maintenance on the bridge, and its condition at the time of the allision. While Mr. Barnes testified that he does not normally use the guidelines in the Truman-Hobbs Bridge Act, he did use similar guidelines in his determination that the rate of depreciation should be 75%.
The main difference between the expert opinions is the condition of the bridge at the time of the accident and the level of maintenance. It is clear from the reasons for judgment that the trial court credited Dr. Prucz's testimony more than that of Mr. Barnes. The court pointed out that Mr. Barnes does not have the expertise of bridge repair and design that Dr. Prucz has. Further, the trial court noted that Mr. Barnes did not inspect the site and "could not even verify the photographs used in his report." Thus, the trial court accepted Dr. Prucz's opinion on the expected life of the bridge in setting the depreciation rate, and used the 50% depreciation rate recommended by Dr. Prucz. We find no abuse of discretion in that determination.
For the foregoing reasons, we affirm the judgment on appeal.
AFFIRMED

In maritime and admiralty law, an "allision" occurs when a moving object strikes a stationary object, while a "collision" occurs when two moving objects strike each other.

La. R.S. 13:4203 provides that, "(l)egal interest shall attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts."

At trial it was shown that the initial low bidder in the public bid process, Johnson Bros., later withdrew its bid and forfeited its bid bond of $128,151.00. That amount was split between Pier 4 and 5. Since Pier 5 was damaged in an unrelated allision, the trial court gave a credit of $64,075.00 to defendants herein for the damage to Pier 4.

There is testimony that the repair was "in kind" by Coast Guard standards even though some of the wood timbers were replaced with steel.

State of Or. By & Through State Highway Comm'n v. Tug Go-Getter, 468 F.2d 1270, 1273 (9th Cir. 1972).

Id.

Id. at 1274.

Id. at 1270.

662 F.2d 1121 (5th Cir. 1981).

15 F.3d 500 (5th Cir. 1994).

State of Or. By & Through State Highway Comm'n v. Tug Go-Getter, supra.

Freeport Sulphur Co. v. S/S Hermosa , 526 F.2d 300, 305 (5th Cir. 1976).

Id.

Id.

Brunet v. United Gas Pipeline Co., 15 F.3d 500, 505 (5th Cir. 1994), citing Freeport Sulphur Co. v. S.S. Hermosa, 526 F.2d 300, 305-06 (5th Cir.1976).

Freeport Sulphur Co. supra, 526 F.2d at 305.

Pillsbury Co. v. Midland Enterprises, Inc., 715 F.Supp. 738, 765-766 (E.D. La. 1989), aff'd and remanded, 904 F.2d 317 (5th Cir. 1990) (citations omitted).

33 C.F.R. § 277.8 (initial paragraph).

In pertinent part, 33 C.F.R. § 277.8(g) reads:
(3) The service life of highway bridges, except for certain long span bridges, is usually limited by obsolescence as well as structural deficiency and deterioration. Obsolescence may be due to insufficient capacity for heavier loads and greater volume of traffic than the bridge was originally designed for, safety requirements, and location. Superstructures and pile bents are considered to have a service life of 50 years. Masonry substructure which could be reused in the renovation of a bridge is considered to have a service life of 100 years.
(4) The foregoing service life figures are not to be used arbitrarily, but as a basis for a fair judgment of the service life considering all other factors that pertain in any particular case.

See La.C.C.P. art. 1918.

Aderholt v. Metro Sec., Inc., 14-880 (La. App. 5 Cir. 3/25/15), 169 So.3d 635, 640.

Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 405 (5th Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).